166 N.J. Super. 335 (1979)
399 A.2d 1023
GRACE PIERCE, PLAINTIFF-APPELLANT,
v.
ORTHO PHARMACEUTICAL CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1978.
Decided March 6, 1979.
*336 Before Judges KOLE and MILMED.
Ms. Ruth Russell Gray argued the cause for appellant.
Mr. Myron J. Bromberg argued the cause for respondent (Messrs. Porzio & Bromberg, attorneys; Ms. Patricia A. Meyer on the brief).
The opinion of the court was delivered by KOLE, J.A.D.
Plaintiff, a physician employed in research by defendant pharmaceutical company, filed a complaint seeking damages resulting from the termination of her employment with defendant, even though such employment was pursuant to an "at-will" relationship. The trial judge granted defendant's motion for summary judgment on the ground that even if plaintiff were constructively discharged and *337 did not actually resign from her employment, by reason of the fact that this was an employment at will, defendant nevertheless had the right to terminate it for any reason whatsoever. This appeal followed.
Since the matter involves a summary judgment motion, the facts set forth below are such as are gleaned from the proofs before the court on that motion, giving plaintiff the benefit of all of such evidence, and the reasonable inferences therefrom, in her favor.
Plaintiff commenced employment with defendant in May 1971 as Associate Director of Medical Research. The terms of her employment were not fixed by contract. In March 1973 she became Director of Medical Research/Therapeutics, a section that studied nonreproductive drugs.
One of the projects pursued by plaintiff was development of loperamide, a liquid treatment for acute and chronic diarrhea to be used by infants, children, older persons and those unable to take a solid form of medication. The formulation contained a high concentration of saccharin, apparently 44 times higher than that which is permitted by the Food and Drug Administration in 12 ounces of an artificially sweetened soft drink. It does not appear, however, that there are any promulgated standards for use of saccharin in drugs. At least one of the experts, a Ph.D., employed by defendant indicated that he did not know of any preparation whose saccharin level was as high as that contained in the loperamide formula and that it was "not desirable" to use such an excessively high level for a pediatric formulation.
Plaintiff worked in conjunction with a project team on the loperamide development. At a meeting of the team on March 6, 1975 it was unanimously agreed that the existing loperamide formula, which had apparently been marketed in Europe, was unsuitable for use in the United States due to the unusually high saccharin content. At the time it was felt that an alternate formulation would require at least three months of development.
*338 The team apparently began to receive pressure to proceed with clinical or human testing of the existing formula, and in late March 1975 it finally acceded to the demands of management in this regard. Plaintiff, however, given her status as the only medical person on the team and her responsibility for recommending the drug for clinical use, maintained her opposition to the high saccharin formula, especially in light of indications that an alternative formula would soon be available. She refused to submit a drug containing such a high level of saccharin for clinical testing, as she could not in good conscience give the formula to old people and children in light of saccharin's potential carcinogenic attributes. She felt that such refusal was required by the Hippocratic Oath.
After indicating that she was unable to pursue clinical testing for the foregoing reasons, plaintiff was relieved of this project and informed by her supervisor, also a physician, that she was being demoted. He advised her that notice of this demotion would be posted. She was also told that she was considered nonpromotable, irresponsible and lacking in judgment and that she had exhibited unacceptable productivity, inability to work with marketing people and failure to behave as a Director. She had not received such criticism from her supervisor before.
Plaintiff thereafter resigned, feeling that she was being punished for refusing to perform a task which she considered to be unethical. The resignation was accepted.
This action followed. Plaintiff sought to recover damages resulting from the termination of her employment. Essentially, the complaint alleged that because of defendant's actions she sustained damage to her professional reputation, interruption of her career, forfeiture of interesting and remunerative employment, monetary loss, deprivation of retirement benefits, loss of four years' seniority, physical and mental distress, and pain and suffering, and other damage was sustained by her and the public; that defendant breached its contract in refusing to permit her to use her expertise, *339 skills and best medical judgment; that defendant, by its actions, violated plaintiff's property right in the form of her expertise and skill in medical and pharmaceutical research; that defendant interfered with plaintiff's employment contract and relationships, and that defendant violated and interfered with plaintiff's right to object to the appropriate regulatory bodies, presumably with regard to the safety of loperamide, the drug with which plaintiff had previously been working.
The trial judge denied defendant's summary judgment motion to the extent that it was based on plaintiff's written resignation, since there was a fact issue as to whether she was, in fact, induced to resign by defendant's actions. This determination is not assailed on this appeal and was proper. However, the judge did grant the summary judgment predicated on his conclusion that under New Jersey law there was no showing that the rule relating to at-will private employees did not apply  namely, that such an employment may be terminated at the will of either employer or employee, with or without justification, in the absence of a contractual or statutory provision to the contrary. See English v. College of Medicine and Dentistry of N.J., 73 N.J. 20, 23-24 (1977). See also Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 150 (1978).
The trial judge held that even if the facts could be construed to indicate that plaintiff was constructively discharged  that is, she resigned by reason of wrongful acts of defendant employer  defendant, nonetheless, had the right to terminate her employment for any reason whatsoever. The judge acknowledged the existence in other jurisdictions of an exception to that rule as to termination of at-will employment when the motivation therefor contravened public policy. He stated that it may be that "public policy will develop to a degree that professionals, even though employees at will, will be permitted to resist what they consider to be a professionally unsound and unethical decision without fear of demotion or discharge." He was of the view that that question *340 had to be decided by the Supreme Court, rather than a trial judge. In any event, he found plaintiff's case to be distinguishable from the out-of-state cases permitting relief on public policy grounds, and that "even if plaintiff's termination [is considered] in the light that it has been presented by the plaintiff, the most that can be said is that she was discharged because of a conflict in a medical viewpoint concerning the advisability of testing the drug loperamide."
We reverse and remand for a trial on all of the issues raised by the pleadings.
This case presents a novel question in this State relating to relief for wrongful discharge of an employee at will where the termination involves a claimed violation of public policy. See O'Sullivan v. Mallon, 160 N.J. Super. 416 (Law Div. 1978). We note in this regard that a growing minority of jurisdictions has created an exception to the traditional employment at-will rule, which generally bars an action for wrongful discharge, so as to permit recovery where the employment termination contravenes a clear mandate of public policy. See, e.g., Harless v. First Nat'l Bank in Fairmont, 246 S.E.2d 270 (W. Va. Sup. Ct. App. 1978); Reuther v. Fowler & Williams, Inc., 386 A.2d 119 (Pa. Super. Ct. 1978); Trombetta v. Detroit, Toledo & Ironton R. Co., 81 Mich. App. 489, 265 N.W.2d 385 (1978); Jackson v. Minidoka Irrigation Dist., 98 Idaho 330, 563 P.2d 54 (1977); Scroghan v. Kraftco Corp., 551 S.W.2d 811 (Ky. Ct. App. 1977); Sventko v. Kroger Co., 69 Mich. App. 644, 245 N.W.2d 151 (1976) (including concurring opinion); Nees v. Hocks, 272 Or. 210, 536 P.2d 512 (1975); Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974) (including dissenting opinion); Frampton v. Central Indiana Gas Co., 297 N.E.2d 425 (Ind. Sup. Ct. 1973); Petermann v. International Brotherhood, etc., 174 Cal. App.2d 184, 344 P.2d 25 (1959). Cf. Larsen v. Motor Supply Co., 117 Ariz. 507, 573 P.2d 907 (Ariz. Ct. App. 1977). Contra, e.g., Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala. Sup. Ct. 1977) (but see dissenting opinion at *341 1132); see West v. First Nat'l Bank of Atlanta, 145 Ga. App. 808, 245 S.E.2d 46 (1978); Freeman v. Elbilco, Inc., 338 So.2d 967 (La. Ct. App. 1976). See also, Blades, "Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power," 67 Colum. L. Rev. 1404 (1967); Note, "A Remedy for the Discharge of Professional Employees Who Refuse to Perform Unethical or Illegal Acts: A Proposal in Aid of Professional Ethics," 28 Vand. L. Rev. 805 (1975).
This new doctrine seems particularly pertinent to professional employees whose activities might involve violations of ethical or like standards having a substantial impact on matters of public interest, including health and safety.
Arguably, the time may have arrived to permit recovery, predicated either on a theory of contract or of tort, for the terminated at-will employee where the circumstances involving the discharge contravene a clear and important public policy. We do not now decide whether any such new doctrine should be adopted in this State or whether this case presents the appropriate vehicle in which to determine that question.
We note that a public policy exception would represent a departure from the well-settled common law employment-at-will rule. If such a departure is to be made, care is required in order to insure that the reasons underlying the rule will not be undermined. Most notably in this regard, the employer's legitimate interests in conducting his business and employing and retaining the best personnel available cannot be unjustifiably impaired. Thus, it cannot change the present rule which holds that just or good cause for the discharge of an employee at will or the giving of reasons therefor are not required. See English v. College of Medicine and Dentistry of N.J., supra; 56 C.J.S. Master and Servant § 31 at 412-413. Compare Nicoletta v. North Jersey Dist. Water Supply Comm'n, supra 77 N.J. at 179-180 (Pashman, J., concurring); Fortune v. National Cash Register Co., 364 N.E.2d 1251 (Mass. Sup. Jud. Ct. 1977); *342 Monge v. Beebe Rubber Co., 316 A.2d 549 (N.H. Sup. Ct. 1974). In addition, the exception must guard against a potential flood of unwarranted disputes and litigation that might result from such a doctrine, based on vague notions of public policy. Hence, if there is to be such an exception to the at-will employment rule, it must be tightly circumscribed so as to apply only in cases involving truly significant matters of clear and well-defined public policy and substantial violations thereof. If it is to be established at all, its development must be on a case-to-case basis.
For these reasons, the adoption of any such new doctrine must be grounded in a specific factual and legal context resulting from a plenary hearing, at which the proofs and public policy considerations involved will be fully developed and taken into account in the final determination. As indicated, we express no views on this issue. The matter should be decided in the first instance by the trial court after a hearing.
We merely hold that the grant of the summary judgment here was premature and a determination of the significant novel question projected by plaintiff, with respect to which such judgment was granted, should have been based upon a full record at a trial. Only in this fashion may the trial court, and if necessary, an appellate court render an appropriate decision on the issue thus presented. See Hoppe v. Ranzini, 158 N.J. Super. 158, 166 (App. Div. 1978); O'Sullivan v. Mallon, supra.
The present record cannot serve as the predicate for determining whether the exception should be adopted and, if so, whether it should be applied in this case. For example, we are satisfied that, using the standard applicable to a summary judgment motion, the court below erred in finding that, even if there were public policy reasons which might be relevant to plaintiff's discharge, "the most that can be said is that she was discharged because of a conflict in a medical viewpoint concerning the advisability of testing the drug loperamide." There is a genuine fact issue as to that matter. *343 Moreover, the question of whether plaintiff resigned or was constructively discharged, which remains unresolved, appears to be so intertwined with that relating to whether a public policy exception should be adopted and applied here, that it is desirable that both issues be tried and determined at a plenary hearing.
Additionally, we note that the instant case seems to implicate (1) an endeavor to compel a physician to violate what appears to be a reasonably supportable ethical standard and (2) the safety of the public in connection with the testing of drugs. If the court decides that plaintiff was discharged, unless the proofs at trial indicate otherwise, the determination of whether relief should be granted by reason of a substantial violation of a clear matter of public policy would be limited to that factual pattern. In ruling on whether a public policy exception should be adopted and applied here, the court may have to determine whether a bona fide dispute between a physician and her superior, also a physician, as to medical ethics relating to a matter of public health and safety is an appropriate consideration under the facts developed at trial. The court may also wish to consider, in addition to the Hippocratic Oath relied on by plaintiff as the ethical standard to which she claims to have adhered, the statutory provisions as to licensing of, and governing, physicians, such as N.J.S.A. 45:9-6 and 45:9-16.
Reversed and remanded for trial. We do not retain jurisdiction.