(No. 53780

RAY PALMATEER, Appellant, v. INTERNATIONAL HARVESTER COMPANY, Appellee.

*Opinion filed April 17, 1981.—Modified on denial of rehearing June 8, 1981.*

Coryn, Walker & Meehan, of Rock Island (Gerald J. Meehan, of counsel), for appellant.

Isador I. Katz, Stuart R. Lefstein, and Dale G. Haake, of Katz, McAndrews, Durkee & Telleen, of Rock Island, for appellee.

MR. JUSTICE SIMON delivered the opinion of the court:

The plaintiff, Ray Palmateer, complains of his discharge by International Harvester Company (IH). He had worked for IH for 16 years, rising from a unionized job at an hourly rate to a managerial position on a fixed salary. Following his discharge, Palmateer filed a four-count complaint against IH, alleging in count II that he had suffered a retaliatory discharge. According to the complaint, Palmateer was fired both for supplying information to local law-enforcement authorities that an IH employee might be involved in a violation of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 1—1 *et seq.*) and for agreeing to assist in the investigation and trial of the employee if requested. The circuit court of Rock Island County ruled the complaint failed to state a cause of action and dismissed it; the appellate court affirmed in a divided opinion. (85 Ill. App. 3d 50.) We granted Palmateer leave to appeal to determine the contours of the tort of retaliatory discharge approved in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172.

In *Kelsay* the plaintiff was discharged in retaliation for filing a worker's compensation claim. The court noted that public policy strongly favored the exercise of worker's compensation rights; if employees could be fired for filing compensation claims, that public policy

would be frustrated. Despite a dissent urging that the creation of a new tort should be left to the legislature, the court said, "We are convinced that to uphold and implement this public policy a cause of action should exist for retaliatory discharge." (74 Ill. 2d 172, 181.) The court then considered the claim for damages, and decided that punitive damages would be allowed in retaliatory discharge cases, but only in the future. The creation of the new tort, at a time when decisions in other jurisdictions conflicted on whether such a firing would be actionable, was sufficiently unexpected that Motorola was not required to pay punitive damages to Kelsay. This court directed, however, that in subsequent cases punitive damages would be available. 74 Ill. 2d 172, 189.

With *Kelsay,* Illinois joined the growing number of States recognizing the tort of retaliatory discharge. The tort is an exception to the general rule that an "at-will" employment is terminable at any time for any or no cause. (*Pleasure Driveway & Park District v. Jones* (1977), 51 Ill. App. 3d 182, 190.) This general rule is a harsh outgrowth of the notion of reciprocal rights and obligations in employment relationships—that if the employee can end his employment at any time under any condition, then the employer should have the same right. (Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute,* 62 Va. L. Rev. 481, 484-85 (1976).) As one 19th century court put it:

> "May I not refuse to trade with any one? May I not forbid my family to trade with any one? May I not dismiss my domestic servant for dealing, or even visiting, where I forbid? And if my domestic, why not my farm-hand, or my mechanic, or my teamster? ***
>
> ***
>
> *** All may dismiss their employes at will,

be they many or few, for good cause, for no cause or even for cause morally wrong, without being thereby guilty of legal wrong." *Payne v. Western & Atlantic R.R. Co.* (1884), 81 Tenn. 507, 518-20.

Recent analysis has pointed out the shortcomings of the mutuality theory. With the rise of large corporations conducting specialized operations and employing relatively immobile workers who often have no other place to market their skills, recognition that the employer and employee do not stand on equal footing is realistic. (Blades, *Employment At Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404, 1405 (1967).) In addition, unchecked employer power, like unchecked employee power, has been seen to present a distinct threat to the public policy carefully considered and adopted by society as a whole. As a result, it is now recognized that a proper balance must be maintained among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out.

By recognizing the tort of retaliatory discharge, *Kelsay* acknowledged the common law principle that parties to a contract may not incorporate in it rights and obligations which are clearly injurious to the public. (See *People ex rel. Peabody v. Chicago Gas Trust Co.* (1889), 130 Ill. 268, 294.) This principle is expressed forcefully in cases which insist that an employer is in contempt for discharging an employee who exercises the civic right and duty of serving on a jury. (*People v. Vitucci* (1964), 49 Ill. App. 2d 171, 172; *People v. Huggins* (1930), 258 Ill. App. 238, 243; see also Ill. Rev. Stat. 1979, ch. 38, par. 155—3 (making it a contempt of court to fire or discipline an employee for attending court when subpoenaed as a

witness).) But the Achilles heel of the principle lies in the definition of public policy. When a discharge contravenes public policy in any way the employer has committed a legal wrong. However, the employer retains the right to fire workers at will in cases "where no clear mandate of public policy is involved" (*Leach v. Lauhoff Grain Co.* (1977), 51 Ill. App. 3d 1022, 1026). But what constitutes clearly mandated public policy?

There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. (*Smith v. Board of Education* (1950), 405 Ill. 143, 147.) Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed. Thus, actions for retaliatory discharge have been allowed where the employee was fired for refusing to violate a statute. Examples are: *Petermann v. International Brotherhood of Teamsters Local 396* (1959), 174 Cal. App. 2d 184, 344 P.2d 25 (for refusing to commit perjury); *Tameny v. Atlantic Richfield Co.* (1980), 27 Cal. 3d 167, 610 P.2d 1330, 164 Cal. Rptr. 839 (for refusing to engage in price-fixing); *Harless v. First National Bank* (W. Va. 1978), 246 S.E.2d 270 (for refusing to violate a consumer credit code); *O'Sullivan v. Mallon* (1978), 160 N.J. Super. 416, 390 A.2d 149 (for refusing to practice medicine without a license). It has also been allowed where the employee was fired for refusing to evade jury duty (*Nees v. Hocks* (1975), 272 Or. 210, 536 P.2d 512; *Reuther v. Fowler & Williams, Inc.* (1978), 255 Pa. Super. 28, 386 A.2d 119), for engaging in statutorily protected union activities

(*Glenn v. Clearman's Golden Cock Inn, Inc.* (1961), 192 Cal. App. 2d 793, 13 Cal. Rptr. 769), and for filing a claim under a worker's compensation statute (*Sventko v. Kroger Co.* (1976), 69 Mich. App. 644, 245 N.W.2d 151; *Frampton v. Central Indiana Gas Co.* (1973), 260 Ind. 249, 297 N.E.2d 425).

The action has not been allowed where the worker was discharged in a dispute over a company's internal management system (*Keneally v. Orgain* (1980), —— Mont. ——, 606 P.2d 127), where the worker took too much sick leave (*Jones v. Keogh* (1979), 137 Vt. 562, 409 A.2d 581), where the worker tried to examine the company's books in his capacity as a shareholder (*Campbell v. Ford Industries, Inc.* (1976), 274 Or. 243, 546 P.2d 141), where the worker impugned the company's integrity (*Abrisz v. Pulley Freight Lines, Inc.* (Iowa 1978), 270 N.W.2d 454), where the worker refused to be examined by a psychological-stress evaluator (*Larsen v. Motor Supply Co.* (1977), 117 Ariz. 507, 573 P.2d 907), where the worker was attending night school (*Scroghan v. Kraftco Corp.* (Ky. App. 1977), 551 S.W.2d 811), or where the worker improperly used the employer's Christmas fund (*Jackson v. Minidoka Irrigation District* (1977), 98 Idaho 330, 563 P.2d 54).

The cause of action is allowed where the public policy is clear, but is denied where it is equally clear that only private interests are at stake. Where the nature of the interest at stake is muddled, the courts have given conflicting answers as to whether the protection of the tort action is available. Compare the inconsistent results where the discharge was for opposition to sexual discrimination or harassment (*McCluney v. Jos. Schlitz Brewing Co.* (E.D. Wis. 1980), 489 F. Supp. 24, and *Monge v. Beebe Rubber Co.* (1974), 114 N.H. 130, 316 A.2d 549), for refusal to falsify official reports (*Hinrichs v. Tranquilaire Hospital* (Ala. 1977), 352 So. 2d 1130, and *Trombetta v. Detroit,*

*Toledo & Ironton R.R. Co.* (1978), 81 Mich. App. 489, 265 N.W.2d 385), and over internal company disputes regarding product safety (*Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174, and *Pierce v. Ortho Pharmaceutical Corp.* (1979), 166 N.J. Super. 335, 399 A.2d 1023).

It is clear that Palmateer has here alleged that he was fired in violation of an established public policy. The claim is that he was discharged for supplying information to a local law-enforcement agency that an IH employee might be violating the Criminal Code, for agreeing to gather further evidence implicating the employee, and for intending to testify at the employee's trial, if it came to that. Because of the procedural posture of the case, these allegations must be accepted as true. (*Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 187.) There is no public policy more basic, nothing more implicit in the concept of ordered liberty (see *Palko v. Connecticut* (1937), 302 U.S. 319, 325, 82 L. Ed. 288, 292, 58 S. Ct. 149, 152), than the enforcement of a State's criminal code. (See *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 61-62; *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 345.) There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens. See Ill. Const. 1970, Preamble; *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 163, 2 L. Ed. 60, 69.

No specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crime-fighters. "Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy. Persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the

fear of unfounded suits by those accused." (*Joiner v. Benton Community Bank* (1980), 82 Ill. 2d 40, 44.) Although *Joiner* involved actions for malicious prosecution, the same can be said for the citizen employee who fears discharge. Public policy favors Palmateer's conduct in volunteering information to the law-enforcement agency. Once the possibility of crime was reported, Palmateer was under a statutory duty to further assist officials when requested to do so. (Ill. Rev. Stat. 1979, ch. 38, par. 31–8.) Public policy thus also favors Palmateer's agreement to assist in the investigation and prosecution of the suspected crime.

The foundation of the tort of retaliatory discharge lies in the protection of public policy, and there is a clear public policy favoring investigation and prosecution of criminal offenses. Palmateer has stated a cause of action for retaliatory discharge.

IH contends that even if there is a public policy discouraging violations of the Criminal Code, that public policy has too wide a sweep. IH points out that the crime here might be nothing more than the theft of a $2 screwdriver. It feels that in the exercise of its sound business judgment it ought to be able to properly fire a managerial employee who recklessly and precipitously resorts to the criminal justice system to handle such a personnel problem. But this response misses the point. The magnitude of the crime is not the issue here. It was the General Assembly, the People's representatives, who decided that the theft of a $2 screwdriver was a problem that should be resolved by resort to the criminal justice system. IH's business judgment, no matter how sound, cannot override that decision. "[T]he employer is not so absolute a sovereign of the job that there are not limits to his prerogative." (*Tameny v. Atlantic Richfield Co.* (1980), 27 Cal. 3d 167, 178, 610 P.2d 1330, 1336, 164 Cal. Rptr. 839, 845.) The law is feeble indeed if it permits IH to take

matters into its own hands by retaliating against its employees who cooperate in enforcing the law.

IH also decries the lack of specificity of Palmateer's complaint. Because the precise crime suspected was not set forth, no one beyond Palmateer, the unnamed employee, and the local law-enforcement agency yet knows the particulars of the investigation. It is understandable that, in view of the novelty of the type of complaint that was filed, Palmateer refrained from identifying his fellow employee through the complaint. IH did not move for a more definite statement, as was its right under section 45 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 45(1)). Instead it merely moved to dismiss the complaint for failing to state a cause of action. "No pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he is called upon to meet." (Ill. Rev. Stat. 1979, ch. 110, par. 42(2).) This complaint is less specific than it could be, but it informed IH of the crux of the claim and stated a cause of action. If IH desires, on remand there are ample procedures under the Civil Practice Act and the rules of this court to put any needed meat on the bones of the complaint.

Finally, IH contends that *Kelsay* requires there be an adversarial relationship before the cause of action for retaliatory discharge is allowed. Even under this theory, it seems that whenever a claim is filed by a former employee, the former employment relationship has already degenerated into an adversarial relationship, at least in the broad sense of the term. But more importantly, *Kelsay* put no such requirement on the cause of action, and we see no rationale for such a limitation. All that is required is that the employer discharge the employee in retaliation for the employee's activities, and that the discharge be in contravention of a clearly mandated public policy.

In order to treat like situations alike, we believe it is

fair to dispose of the prayer for punitive damages in this case in the same manner as punitive damages were treated in *Kelsay*. As already noted, this court set aside the punitive damage award, directing that, in cases involving the tort of retaliatory discharge, punitive damages would be allowed only in future cases. The plaintiff was discharged 14 months before the filing of this court's opinion in *Kelsay*. Therefore, to be consistent with the holding in *Kelsay*, punitive damages should not be awarded here.

The cause of action expressed in count II of Palmateer's complaint was improperly dismissed, and the cause should be returned to the circuit court for further proceedings. Because it is not certain that a trial will ensue, we decline IH's invitation to express our opinion on the instructions to be given at a retaliatory-discharge trial. That should, if necessary, await another case which has generated a fuller record. (Compare *Pierce v. Ortho Pharmaceutical Corp.* (1979), 166 N.J. Super. 335, 399 A.2d 1023.) The plaintiff has not appealed the dismissal of counts I, III and IV of his complaint; those portions of the appellate and circuit court judgments dismissing them are therefore to be left undisturbed. The judgments of the appellate and circuit courts with respect to count II, except for the prayer of that count for punitive damages, are reversed, and the cause is remanded to the circuit court of Rock Island County for further proceedings with respect to count II.

> *Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded, with directions.*

MR. JUSTICE UNDERWOOD, dissenting:

For the reasons stated in my dissent in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 190, I believe the

court there erred. The thoughts expressed in that dissent regarding judicial self-restraint are equally applicable here. In addition, I share Mr. Justice Ryan's criticism of the court's action in this case.

MR. JUSTICE RYAN, also dissenting:

Although I authored the opinion in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, I cannot agree to extend the cause of action for retaliatory discharge approved in that case into the nebulous area of judicially created public policy, as has been done by the opinion in this case. I fear that the result of this opinion will indeed fulfill the prophesy of Mr. Justice Underwood's dissent in *Kelsay.* "Henceforth, no matter how indolent, insubordinate or obnoxious an employee may be, \*\*\* [the] employer may thereafter discharge him only at the risk of being compelled to defend a suit for retaliatory discharge and unlimited punitive damages \*\*\*." *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 192.

*Kelsay* relied on the fact that the legislature had clearly established the public policy that injured workers had a right to file claims for compensation with the Industrial Commission. We there held that discharging the employee for filing such a claim violated that public policy. Here the public policy supporting the cause of action cannot be found in any expression of the legislature, but only in the vague belief that public policy requires that we all become "citizen crime-fighters" (85 Ill. 2d at 132).

Many of our cases state that public policy is to be found in the constitution and the statutes of this State and, when these are silent, in the decisions of the courts. (*People ex rel. Nelson v. Wiersema State Bank* (1935), 361 Ill. 75, 86; *Illinois Bankers Life Association v. Collins* (1930), 341 Ill. 548, 551; *Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 193.) There are other

opinions of this court which simply say that the public policy of this State is to be found in its constitution and statutes and make no mention of the role of judicial decisions. (See *Smith v. Hill* (1958), 12 Ill. 2d 588, 598; *Knass v. Madison & Kedzie State Bank* (1933), 354 Ill. 554, 567; *People ex rel. Peabody v. Chicago Gas Trust Co.* (1889), 130 Ill. 268, 296.) Whatever the accepted role of the judiciary may be in declaring public policy, it is generally acknowledged that the question of public policy is first and foremost a matter of legislative concern. *Nudd v. Matsoukas* (1955), 6 Ill. App. 2d 504, 516, *rev'd on other grounds* (1956), 7 Ill. 2d 608; *Fidelity Savings Bank v. Aulik* (1948), 252 Wis. 602, 32 N.W.2d 613; *Scroghan v. Kraftco Corp.* (Ky. App. 1977), 551 S.W.2d 811.

In *Petermann v. International Brotherhood of Teamsters, Local 396* (1959), 174 Cal. App. 2d 184, 344 P.2d 25, the court stated that public policy is a vague expression and is not subject to precise definition. In *Zeigler v. Illinois Trust & Savings Bank* this court also stated that there is no precise definition of public policy. In attempting to define public policy, this court has stated that it is that principle of law which declares that no one may lawfully do that *which has a tendency* to be injurious to the public welfare or to be against the public good. (*People ex rel. Nelson v. Wiersema State Bank* (1935), 361 Ill. 75, 86; *Knass v. Madison & Kedzie State Bank* (1933), 354 Ill. 554, 567.) Stating the converse of this definition, it can be said that public policy favors that *which has a tendency* to be beneficial to the public welfare or to be for the public good. In view of such a general definition, the correctness of the statement that public policy is a vague expression and is not subject to precise definition cannot be questioned. Certainly, no employer should be subject to suit and unlimited punitive damages based on a nebulous charge that he discharged an employee for doing that *which has a tendency* to be beneficial to the public welfare

or for the public good. To sustain a cause of action for retaliatory discharge, the limitations on the employer's right to discharge employees must be more precisely defined.

In *Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174, a salesman for a steel manufacturer, after having originally complained to his superior, later bypassed his immediate superior and complained to a company vice-president about the safety of a product the company manufactured. The salesman was discharged and thereafter sued his employer in tort, contending he had acted in the best interests of the general public and of his employer. The Supreme Court of Pennsylvania stated that, in essence, the plaintiff contended that his conduct should be protected because his intentions were good. The court noted that no doubt most employees who are discharged could make the same claim. The court affirmed the lower court's dismissal of the complaint and observed that the praiseworthiness of the plaintiff's motives does not detract from the company's legitimate interest in preserving its normal operational procedures from disruption. The court voiced its concern as to the impact of such suits on the legitimate interest of employers in hiring and retaining the best personnel. The court stated that the ever-present threat of suit might well inhibit the making of critical judgments by employers concerning employees' qualifications.

In *Abrisz v. Pulley Freight Lines, Inc.* (Iowa 1978), 270 N.W.2d 454, a discharged employee sued her employer, who had discharged her for writing a letter supporting a fellow employee's claim for unemployment compensation. In the letter, she severely criticized her employer's business policies. The employee claims her discharge was for reasons contravening public policy. The Supreme Court of Iowa stated that the plaintiff had not established that her discharge violated public policy.

"Courts should not declare conduct violative of public policy unless it is clearly so." (*Abrisz v. Pulley Freight Lines, Inc.* (Iowa 1978), 270 N.W.2d 454, 456.) The court also stated: "In considering this matter we keep in mind the rights of the employer, as well as those of the employee, are important." *Abrisz v. Pulley Freight Lines, Inc.* (Iowa 1978), 270 N.W.2d 454, 456.

In *Scroghan v. Kraftco Corp.* (Ky. App. 1977), 551 S.W.2d 811, the plaintiff had been discharged after he announced his intentions to attend law school at night. He sued his former employer, contending that his discharge violated public policy, urging that continued education has been established as a public policy in the United States. The court, after noting that public policy is first and foremost a matter for legislative determination, stated:

"The legislature has not seen fit to establish any policy in this area, and we are not convinced that this is a proper area for the exercise of judicial activism." *Scroghan v. Kraftco Corp.* (Ky. App. 1977), 551 S.W.2d 811, 812.

In *Geary, Abrisz,* and *Scroghan* the employees' conduct can be said to have a tendency to be beneficial to the public welfare or to be for the public good, but the courts refused to declare, by judicial fiat, that discharging employees for such conduct contravened public policy. The citing of these three cases is not intended to be an exhaustive examination of the subject. They are cited to demonstrate that the courts are not willing to create a cause of action for a discharged employee simply because his conduct was praiseworthy or because the public may have derived some benefit from it.

Because of the vagueness of the concept of public policy, most of the jurisdictions that have allowed a discharged employee to maintain a cause of action for retaliatory discharge have required that the public policy against such discharge be *clear* and *well-defined,* that the mandate

of public policy be *clear* and *compelling,* and that there be *strong public policy* against such discharge. *Percival v. General Motors Corp.* (E.D. Mo. 1975), 400 F. Supp. 1322, *aff'd* (8th Cir. 1976), 539 F.2d 1126; *Campbell v. Ford Industries, Inc.* (1976), 274 Or. 243, 546 P.2d 141; *Jones v. Keogh* (1979), 137 Vt. 562, 409 A.2d 581; *Harless v. First National Bank* (W. Va. 1978), 246 S.E.2d 270; *Geary v. United States Steel Corp.* (1974), 456 Pa. 171, 319 A.2d 174.

In *Becket v. Welton Becket & Associates* (1974), 39 Cal. App. 3d 815, 114 Cal. Rptr. 531, the employee, as the executor of an estate, had filed a suit against his employer. When he refused to terminate the litigation, he was discharged. He then sued his employer, contending that his discharge was in retaliation for action protected by public policy. The court, in analyzing California law, noted that, in cases allowing such an action, the public policy was evidenced by either a criminal statute or a statute specifically designed to protect the rights of the employee. The court pointed out that there was no articulated public policy through legislative action which was violated by the employer.

In *Tameny v. Atlantic Richfield Co.* (1980), 27 Cal. 3d 167, 177, 610 P.2d 1330, 1336, 164 Cal. Rptr. 839, 845, Mr. Justice Tobriner, writing for the court, acknowledged that many of the California cases for wrongful discharge were based on statutes which specifically barred discharge for certain conduct. The opinion pointed out, however, that the courts also allowed discharged employees to maintain actions for retaliatory discharge where general statutes affording employees certain rights or privileges "articulated a *fundamental public policy* which the employer's discharge clearly contravened." (Emphasis added.) (*Tameny v. Atlantic Richfield Co.* (1980), 27 Cal. 3d 167, 177, 610 P.2d 1330, 1336, 164 Cal. Rptr. 839, 845.) The courts in the cases cited above, by referring to

*clear* and *well-defined* public policy, *clear* and *compelling* public policy, *strong* public policy, and *fundamental* public policy, acknowledge that public policy may exist in varying degrees. Only in cases where there have been clearly articulated, strong, fundamental, compelling, and well-defined policies can a discharge which contravened these policies give rise to a tort action for retaliatory discharge. The clear articulation of such a policy has almost always been found in legislative pronouncement.

In two cases usually discussed by courts considering retaliatory discharge, recovery was permitted in actions for retaliatory discharge based on "bad faith." In *Monge v. Beebe Rubber Co.* (1974), 114 N.H. 130, 316 A.2d 549, a female employee was discharged after she refused to go out with her foreman. The New Hampshire Supreme Court held that the termination of employment motivated by bad faith or malice was based on retaliation, constituting a breach of the employment contract. In *Fortune v. National Cash Register Co.* (1977), 373 Mass. 96, 364 N.E.2d 1251, a salesman sued his former employer after he was discharged. The court held that the contract of employment contained an implied covenant of good faith and fair dealing and that a termination not made in good faith constitutes a breach of the contract. These cases are readily distinguishable from the strong-public-policy line of cases, in that, in the last two cases discussed, recovery was sought and allowed for breach of contract and not for a tort, and punitive damages were not sought.

It is indeed praiseworthy that the plaintiff in our case is interested in ferreting out crime. His complaint, however, does not allege conduct on his part that will bring it within the area of any public policy that has been articulated by the legislature. The plaintiff was not discharged for failing to violate or for complying with the requirements of our obstruction-of-justice statute (Ill. Rev. Stat. 1979, ch. 38, par. 31—4), or of the section of

our statute concerning refusing to aid an officer (Ill. Rev. Stat. 1979, ch. 38, par. 31–8). These sections were referred to in the majority opinion. If the plaintiff would have been discharged for such a reason, *strong, clear, fundamental* articulated public policy would have been contravened and an action in tort would then be appropriate. The complaint, however, does not even allege that a crime had been committed or that the plaintiff reported to the law-enforcement agency that a crime had been committed. It only alleges that plaintiff was discharged because he reported to a law-enforcement agency that an employee of the defendant *might* be involved in a violation of the criminal code and that he had agreed to assist the law-enforcement agency in gathering further information. It should be remembered that the plaintiff was not a unionized employee, but held a position in management. By assuming the role of a "citizen crime-fighter" undertaking to ferret out crime for the police the plaintiff, through his spying, could seriously affect labor relations of his employer. Also, his conduct, without consulting with the proper management personnel, could impair the company's internal security program. In other words, the plaintiff here had taken it upon himself to become involved in crime fighting when it was neither required by law, nor by his employment, and obviously was against the wishes of his employer.

By departing from the general rule that an at-will employment is terminable at the discretion of the employer, the courts are attempting to give recognition to the desire and expectation of an employee in continued employment. In doing so, however, the courts should not concentrate solely on promoting the employee's expectations. The courts must recognize that the allowance of a tort action for retaliatory discharge is a departure from, and an exception to, the general rule. The legitimate interest of the employer in guiding the policies and destiny

of his operation cannot be ignored. The new tort for retaliatory discharge is in its infancy. In nurturing and shaping this remedy, courts must balance the interests of employee and employer with the hope of fashioning a remedy that will accommodate the legitimate expectations of both. In the process of emerging from the harshness of the former rule, we must guard against swinging the pendulum to the opposite extreme. In *Percival v. General Motors Corp.* (8th Cir. 1976), 539 F.2d 1126, 1130, the court stated:

> "It should be kept in mind that as far as an employment relationship is concerned, an employer as well as an employee has rights; ***."

The district court opinion in *Percival* stated:

> "The courts which have recognized this non-statutory cause of action have done so *cautiously,* recognizing that a *proper balance* must be maintained between the employee's interest in earning his livelihood and the employer's interest in operating his business efficiently and profitably." (Emphasis added.) *Percival v. General Motors Corp.* (E.D. Mo. 1975), 400 F. Supp. 1322, 1323.

The deteriorating business climate in this State is a topic of substantial interest. A general discussion of that subject is not appropriate to this dissent. It must be acknowledged, however, that Illinois is not attracting a great amount of new industry and business and that industries are leaving the State at a troublesome rate. I do not believe that this court should further contribute to the declining business environment by creating a vague concept of public policy which will permit an employer to discharge an unwanted employee, one who could be completely disruptive of labor-management relations through his police spying and citizen crime-fighter activities, only at the risk of being sued in tort not only for compensatory damages, but also for punitive damages.

I am not alone in my concern over the adverse effect that the loose application of the retaliatory-discharge remedy will have on business. I noted above the concern voiced by the Supreme Court of Pennsylvania in *Geary* and by the Supreme Court of Iowa in *Abrisz*. In *Pierce v. Ortho Pharmaceutical Corp.* (1979), 166 N.J. Super. 335, 341, 399 A.2d 1023, 1026, the court stated:

"[T]he employer's legitimate interests in conducting his business and employing and retaining the best personnel available cannot be unjustifiably impaired."

The court went on to state:

"In addition the exception [to the general rule] must guard against a potential flood of unwarranted disputes and litigation that might result from such a doctrine, based on *vague* notions of public policy. Hence, if there is to be such an exception to the at-will employment rule, it must be *tightly circumscribed* so as to apply only in cases involving truly *significant* matters of *clear* and *well-defined* public policy and *substantial* violations thereof." (Emphasis added.) (*Peirce v. Ortho Pharmaceutical Corp.* (1979), 166 N.J. Super. 335, 342, 399 A.2d 1023, 1026.)

In *Monge v. Beebe Rubber Co.* the New Hampshire Supreme Court, while allowing recovery on a contract theory for a "bad faith" discharge, nonetheless acknowledged the necessity of balancing the interests of employer and employee. The court stated:

"Such a rule affords the employee certain stability of employment and does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably." *Monge v. Beebe Rubber Co.* (1974), 114 N.H. 130, 133, 316 A.2d 549, 551-52.

The majority opinion cites Blades, *Employment At Will vs. Individual Freedom: On Limiting The Abusive Exercise Of Employer Power,* 67 Colum. L. Rev. 1404 (1967). Professor Blades, while promoting an expansion of an employee's right to sue his employer for wrongful discharge, recognizes the adverse effect of such litigation on the employer's business:

> "[T]here is the danger that the average jury will identify with, and therefore believe, the employee. This possibility could give rise to vexatious lawsuits by disgruntled employees fabricating plausible tales of employer coercion. If the potential for vexatious suits by discharged employees is too great, employers will be inhibited in exercising their best judgment as to which employees should or should not be retained. \*\*\* [T]he employer's prerogative to make independent, good faith judgments about employees is important in our free enterprise system." 67 Colum. L. Rev. 1404, 1428 (1967).

In order to establish the necessary balance between employer and employee interests, I would hold that the employee may maintain an action for retaliatory discharge only when the discharge has been violative of some *strong* public policy that has been *clearly* articulated. Usually, that clear articulation would be found in legislative enactment. I do not think that an employer should be compelled to defend a tort action and possibly be forced to pay a disgruntled discharged employee compensatory, and possibly substantial punitive, damages because of a violation of some vague concept of public policy that has never been articulated by anyone except four members of this court.

I therefore respectfully dissent.

MR. JUSTICE MORAN joins in this dissent.