JAMES C. BRYCE, Plaintiff-Appellee, *v.* JOHNSON & JOHNSON, Defendant-Appellant.

First District (1st Division)   No. 82—0379

Opinion filed June 6, 1983.—Rehearing denied July 18, 1983.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (Ronald L. Lipinski and Cynthia G. Swiger, of counsel), for appellant.

Carey & Scheuneman, Ltd., of Chicago (Peter B. Carey, Regina K. McCabe, and John J. O'Toole, of counsel), for appellee.

JUSTICE GOLDBERG delivered the opinion of the court:

This appeal involves an action for retaliatory discharge brought by James C. Bryce, an employee (plaintiff), against Johnson & Johnson, a corporation, his employer (defendant). After trial by the court, judgment was entered in favor of plaintiff for $350,000. Defendant has appealed.

Plaintiff was employed by defendant since 1969. The mutual rights and obligations of the parties are covered by a comprehensive collective bargaining agreement between defendant and Textile Workers Union of America (union). The pertinent facts are not easily stated. There are several conflicts in the evidence. Also, both sides have departed from the applicable rule requiring the facts to be stated "accurately and fairly without argument or comment." 87 Ill. 2d Rules 341(e)(6), 341(f).

Defendant has a plant in Chicago which manufactures ointments and gauze products used for dressings. Part of this work is done in a sterile environment. Commencing about November of 1969, plaintiff worked for defendant as a material handler for about eight months. He left for a short time and returned to work again during 1970. Plaintiff worked in the so-called aseptic room and in two other associated rooms. Plaintiff was then in good health. His duties in the aseptic room required him to lift certain items including bottles and bottle cases which varied in weight and were often as heavy as approximately 40 to 50 pounds. No heavier weights were lifted by him without the aid of a machine or another person. Racks of bottles were placed on trays which were put on a movable truck and pushed into a sterilizer. Plaintiff also worked in the adaptic room which required him to lift trays weighing 52 pounds up from the floor to a refrigerator shelf about as high as his head.

On January 6, 1975, while working in the aseptic room, plaintiff sustained a back injury. Plaintiff's foot slipped as he was loading bot-

tles onto a tray for washing. This mishap occurred "out of and in the course of" plaintiff's employment. Ill. Rev. Stat. 1981, ch. 48, par. 138.2.

Dr. Evelyn Adams, employed by defendant, recommended plaintiff receive medical treatment from Dr. John F. Flynn, Jr. During February of 1975, plaintiff· was operated on by Dr. Flynn for partial removal of one of the discs between the vertebrae. This surgery is referred to as a "partial laminectomy." Dr. Flynn did not discharge plaintiff from his care until January 19, 1976, approximately one year after the mishap.

On March 20, 1975, plaintiff filed an application for adjustment of claim with the Illinois Industrial Commission. Plaintiff received temporary total compensation and defendant assumed and paid all of the medical expenses as well as additional compensation. The arbitrator also awarded plaintiff compensation of $83.20 per week for 150 weeks.

Plaintiff testified that during late November 1975, he spoke to Joseph Beemster, who managed safety and security for defendant. Beemster told plaintiff he "didn't need a lawyer, that Johnson & Johnson [defendant] would take care of me." Beemster denied this conversation. He testified he told plaintiff that he should get back to work as soon as he could. Beemster testified he had a conversation with plaintiff about August of 1975. Plaintiff said he was going "to screw" Dr. Adams, the company and the union. Beemster told plaintiff that he (Beemster) "was very upset."

Beemster also testified to a conversation with plaintiff near the end of 1975. At that time plaintiff told him he wanted to come back and do his job. Plaintiff picked up some heavy boxes to demonstrate. Beemster advised plaintiff to put the boxes down. He said, "Don't get hurt." Beemster testified that these were the only conversations he had with plaintiff. He testified he never at any time told plaintiff not to file a workmen's compensation claim and he never did anything to discourage plaintiff from filing such a claim.

During the summer of 1975, plaintiff visited defendant's plant. John Devine, department manager of defendant, asked plaintiff when he would return to work. Plaintiff stated this was up to his doctor. Plaintiff testified Devine told him "he was not going to hold the job open too long" for plaintiff.

During plaintiff's extended absence the question of posting plaintiff's old position came up. The union president requested that the posting wait because plaintiff was on a workmen's compensation leave. Defendant's representative agreed to wait "2 weeks or so" be-

fore posting.

After a wait, the defendant did post the job. In late 1975, plaintiff's position was filled after posting and bidding in accordance with the collective bargaining agreement. Both of the briefs comment and argue upon this situation. On October 29, 1975, plaintiff's union filed a grievance based upon posting of plaintiff's job. However, the grievance was denied by defendant. The union officials suggested to defendant that plaintiff's real concern was to work on the first shift. The grievance was apparently then dropped. When plaintiff returned to work in January of 1976, he took a new job as janitor but he retained all of his seniority rights including the right to bid on any posted job.

Upon plaintiff's return to work on January 19, 1976, he was assigned to the midnight shift. This new assignment reduced his earnings approximately 50%. He had no overtime or incentive pay. His duties included sweeping, mopping and cleaning up. Plaintiff testified he was directed to perform work which exceeded the lifting requirements of his previous job. However, there is testimony to the contrary that the normal duties of the janitor job did not require such lifting. There is testimony that this new job was worked out by discussion between the union and management representatives as temporary employment for plaintiff to protect plaintiff from possible injury.

By January of 1976, plaintiff was free from pain and he resumed his ordinary personal activities. He had a slight limp and he was still wearing a back brace. Dr. Flynn directed him to wear the brace for 30 days after he resumed work. When plaintiff returned to work, he gave Dr. Adams a note from Dr. Flynn. Dr. Flynn also wrote directly to Dr. Adams. Dr. Flynn stated that plaintiff was able to return to work but the doctor wished to continue to see him every four to six months. Dr. Flynn also write, concerning plaintiff, that he should have two or three rest periods a day and "he is to be limited with regard to lifting no more than 25 pounds."

On January 28, 1976, plaintiff wrote to the chairman of the board of defendant. This was a lengthy communication in which plaintiff stated that when he returned to work he was given "a much harder job" on a late shift and with a reduction in pay. In this letter, plaintiff also stated that he was ordered by one of his superiors to give unsterilized bottles to machine operators in situations which required sterility. In responding to this letter, defendant's director of personnel wrote plaintiff and told him that this charge had been "thoroughly investigated" and that since December of 1974 the defendant had strictly complied with all such regulations. On March 23, 1976, the di-

rector of personnel prepared a memorandum to the effect that plaintiff had been informed that proper procedures were being followed in the plant and that defendant company "could not tolerate any further conduct by him which in any way defamed the company or its products and further conduct of this nature by plaintiff could result in his discharge."

As a result of plaintiff's letter, the manager of labor relations at defendant's plant made an investigation and a written report. This lengthy communication pointed out that restoring plaintiff to his former job would increase the risk of injury. The communication also recommended that plaintiff "be separated upon incurrence of the next Medical Leave of Absence or extended absence due to illness or injury."

There is a quantity of testimony in the record, all conflicting, as to whether the duties imposed upon plaintiff by his new job as a janitor were harder than those of his former job in the aseptic room. Plaintiff testified he was required to move items referred to as pallets occasionally in connection with his duties. However, he used a hydraulic lift to move these items for sweeping purposes. Plaintiff mentioned the need to move steel cores weighing 130 pounds. However, he testified that these cores were moved with the help of an electric hoist. We do not regard this question as being the decisive issue in the case. In fact, as will be shown, plaintiff worked at his new post less than three months until his next injury.

The union president testified plaintiff told him privately there was no problem with the company products but he was only making these charges in an effort to get his old job back. This alleged conversation occurred on March 19, 1976, some two months after plaintiff started to work at his new post. Plaintiff also testified he was told at a meeting with defendant's representatives that he was not going to get his old job back. Plaintiff also testified he was threatened then with termination of his employment. In any event, the meeting terminated without action by either side.

After this meeting, and on March 22, 1976, plaintiff filed a charge against defendant before the National Labor Relations Board. This charge claimed discrimination by the defendant against plaintiff because of his union activities. Plaintiff also filed an amended charge against defendant on April 1, 1976. This amended charge also alleged defendant "has discriminated against" plaintiff "because of his union" activity. Plaintiff testified that he filed these charges only against the union. Plaintiff testified he had an attorney who might have filed the charges against the employer. However, copies of the charges show

that the defendant was the target. In any event, a response to the charges was filed by the defendant. After investigation by the National Labor Relations Board, plaintiff's complaint was denied. The Board found the action of defendant in posting and filling plaintiff's former job was in accordance with the collective bargaining agreement and failure of defendant to reinstate plaintiff to his former job was not because of "union and/or protected concerted activities" by plaintiff.

The union president testified plaintiff's job was temporary and was "created strictly for Jim [plaintiff] to keep him from possibly hurting himself again." Dr. Adams testified at trial that when plaintiff returned to work he was in fact unable to perform his former job but could perform the duties of a janitor's job and remain within the restrictions imposed by medical necessity. Some two weeks after plaintiff's return, during March of 1976, Dr. Adams wrote to Dr. Flynn regarding a letter from Dr. Flynn advising that plaintiff could return to his usual work. Dr. Adams accordingly sent Dr. Flynn a job description of the lifting necessary if plaintiff worked in the aseptic room. Dr. Flynn returned this sheet with the notation that after examining it and after "a long, honest discussion with the patient" he felt "the patient may resume working at his old job." However, defendant did not return plaintiff to his job in the aseptic room. As shown, this opening had previously been filled by posting in accordance with the collective bargaining agreement.

The evidence also shows that Joseph Beemster wrote a memo dated March 4, 1976, which states he had suggested to plaintiff that plaintiff could work as a machine operator in the adaptic room. Such a position had been posted by defendant. The memo stated Beemster reviewed this with Dr. Adams who thought it feasible for plaintiff as no heavy lifting was required. Beemster stated in the memo he suggested this opening to plaintiff but plaintiff only wanted his former job. Beemster testified he telephoned plaintiff on two occasions regarding this job but plaintiff responded he was not interested. Plaintiff testified he never had knowledge that this job of machine operator had been posted or was available. He denied that he had spoken to Beemster about it.

Plaintiff testified that on April 2, 1976, his supervisor ordered him to weigh two large cartons of waste gauze. Plaintiff responded he was physically unable to do this. The supervisor told him to get some help. Plaintiff responded he could not find anybody and, "I can't weigh them." Plaintiff testified the supervisor said, "Well, do it, or else." Plaintiff then went back to the scales and attempted to move

one of the boxes with a board. This box weighed 232 pounds. Plaintiff felt a sharp pain in his back and his legs began to hurt. When he reported this to his supervisor, the supervisor, adding some strong language, told plaintiff to report to the medical department.

The testimony regarding this encounter was denied by the supervisor. His testimony was that the standard procedure for weighing cartons of gauze was to wheel the cart with the cartons on, to the scale, take a total weight reading and then deduct the weight of the cart. This weight was stenciled on the carts. Plaintiff in turn denied the existence of this procedure. The supervisor conceded he could not recall advising plaintiff thereof.

Joseph Beemster, defendant's director of safety and health, testified that about March of 1976 he saw plaintiff take a box of gauze and slide it off of a hand truck and onto a scale. He told plaintiff, "Jim, you're going to get hurt. Don't do that." Beemster stated plaintiff made no response to him.

It is undenied that plaintiff was injured on April 2, 1976. This mishap also occurred, "out of and in the course of" plaintiff's employment. In due course plaintiff filed his application for adjustment with the Illinois Industrial Commission. The Commission found plaintiff was totally and permanently disabled. Plaintiff was allowed temporary total disability as well as a permanent disability allowance. The record shows that plaintiff was subjected to additional surgery referred to as a complete laminectomy and a spinal fusion. Plaintiff filed this suit on July 21, 1977.

Each of the briefs before us makes a number of separate contentions and cites a profusion of authorities. Under the view we take of this record, it is not necessary to consider most of these problems.

In a recent opinion of the supreme court, the thought is well expressed that common law rights and liabilities pertaining to the right and ability of an injured employee to recover for that injury from the employer have been abrogated by statute. In *Sharp v. Gallagher* (1983), 95 Ill. 2d 322, 326, citing *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1958), 13 Ill. 2d 460, 463, 150 N.E.2d 141, the court described the workmen's compensation law:

> "The legislature enacted the Workmen's Compensation Act to abrogate the common law rights and liabilities which previously governed an injured employee's ability to recover against his employer. The Act established a new 'system of liability without fault, designed to distribute the cost of industrial injuries without regard to common-law doctrines of negligence, contributory negligence, assumption of risk, and the like.' [Citation.]"

The legislature properly deemed it necessary to protect the cause of action thus vested in the employee to make certain that every employee whose work came within the scope of the statute was to have a free and complete right to exercise this remedy with absolute freedom from any type of discrimination of coercion. The statute provides (Ill. Rev. Stat. 1981, ch. 48, par. 138.4(h)):

"It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him by this Act or to discriminate, attempt to discriminate, or threaten to discriminate against an employee in any way because of his exercise of the rights or remedies granted to him by this Act.

It shall be unlawful for any employer, individually or through any insurance company or service or adjustment company, to discharge or to threaten to discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his rights or remedies granted to him by this Act."

Perhaps the most pertinent authority in considering rights and remedies protected by these provisions of the statute is *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. There, the supreme court allowed an employee a cause of action for retaliatory discharge. The court described the "trade off between employer and employee" which was the basis for the Workmen's Compensation Act. (74 Ill. 2d 172, 180.) The employee gave up common law rights to proceed against his employer in court and, in turn, recovery for injury arising "out of and in the course of" the employment was made automatic. (74 Ill. 2d 172, 180.) On the other hand, the liability of the employer was fixed to protect against "sympathies of jurors whose compassion for fellow employees often led to high recovery." (74 Ill. 2d 172, 180.) The supreme court expressed the important thought that the entire fabric of workmen's compensation would be dangerously threatened if any employer would abuse his power "by threatening to discharge employees for seeking compensation under the Act." 73 Ill. 2d 172, 182.

From a factual point of view the decisive aspect of *Kelsay* is that after plaintiff was injured at her work the personnel manager of the defendant told her flatly "it was the corporation's policy to terminate the employment of employees who pursued workmen's compensation claims against it." (74 Ill. 2d 172, 179.) Plaintiff "decided to proceed with her claim" and "was discharged." (74 Ill. 2d 172, 179.) These

were the crucial factors in *Kelsay* which prompted the supreme court to approve the cause of action for retaliatory discharge.

■ It is immediately apparent that the record before us does not contain sufficient proof to establish defendant's guilt of retaliatory discharge. To begin with, there was no discharge of this plaintiff. Plaintiff continued to work until the unfortunate accident which occurred on April 2, 1976. Plaintiff had previously filed a claim for compensation resulting from the injuries which he suffered while working on January 6, 1975. Plaintiff properly filed another petition for compensation before the Commission not long after April 2, 1976. It is apparent that from and after that date plaintiff was totally and permanently incapable of further work.

The entire record before us shows that the defendant did not "interfere with, restrain, or coerce" the employee in any manner whatsoever in the exercise of the rights and remedies vested in plaintiff by virtue of the Workmen's Compensation Act. The record shows considerable friction between plaintiff and his employer. But, these various interchanges between the parties are far from showing a discharge. The blunt and inescapable fact of the matter is that plaintiff was never discharged.

Realizing that no actual discharge appears in this record, plaintiff makes the contention that where an employer deliberately makes the employee's working conditions so intolerable that it forces him to quit, such conduct amounts to a "constructive" discharge and calls for application of the remedy for retaliatory discharge. Here again the difficulty is that plaintiff was never forced to quit and never did quit.

Plaintiff cites in this regard only a number of Federal cases which use the term "constructive discharge." Actually, one of these authorities involves an issue of discrimination under the Federal Civil Rights Act. (See *Muller v. United States Steel Corp.* (10th Cir. 1975), 509 F.2d 923.) Plaintiff in the case at bar does not seek to invoke Federal law. After studying all of the testimony with the utmost of care, we cannot conclude that there was a retaliatory discharge.

Even assuming that plaintiff was unjustly treated, as may be inferred from his own testimony, there is one factor which is completely lacking to create a cause of action under this statutory enactment. The missing link is the total absence of even the slightest interference by defendant in the exercise by plaintiff of all of his rights under the Workmen's Compensation Act. Plaintiff testified he was told by one of his superiors that he did not need a lawyer but that the defendant would take care of him. Taking this testimony at face value, it is not by any means equivalent to even the slightest violation of the above-

quoted statute concerning restraint or coercion against the employee in any manner for exercising his rights under the Workmen's Compensation Act. Plaintiff exercised these rights with complete effectiveness on each of the occasions that he was injured in the course of performance of his duties.

■ Plaintiff also makes a contention based upon the second portion of the Workmen's Compensation Act above quoted. Plaintiff argues that the defendant refused to rehire him or recall him "to active service in a suitable capacity." Plaintiff urges that defendant acted to strip plaintiff of his former job because plaintiff "had pursued his rights under the Workmen's Compensation Act *and* received a remedy ***." However, plaintiff's own conduct has contradicted this argument.

In plaintiff's letter to defendant's chairman, dated January 28, 1976, plaintiff made no claim of any attempt by defendant to frustrate plaintiff's first proceeding before the Industrial Commission. Plaintiff said only, "I was punished for having been injured." As shown, on March 22, 1976, after plaintiff had returned to his employment, plaintiff filed a charge against defendant before the National Labor Relations Board. This charge was not based upon any alleged retaliation against plaintiff for pursuing his rights under the Workmen's Compensation Act. On the contrary, this charge was that plaintiff had been discriminated against by defendant because of plaintiff's union activities. Plaintiff filed an amended charge on April 1, 1976, which charged defendant with discrimination against plaintiff "because of his union activity." This demonstrates that plaintiff himself realized and effectively proved that defendant never did anything against plaintiff "because of the exercise of his [plaintiff's] rights or remedies granted to him by this Act." (Ill. Rev. Stat. 1981, ch. 48, par. 138.4(h).) It is true that defendant litigated the claims before the Industrial Commission but this certainly cannot be construed as a violation of any statute.

This record thus presents no situation regarding manifest weight or sufficiency of evidence. We have here a complete absence of proof of violation of the basic statute quoted above.

Plaintiff also relies upon *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876. *Palmateer* was decided on the pleadings. Plaintiff there was actually discharged. He alleged that he was discharged because he supplied information to local law-enforcement authorities that a fellow employee might be involved in commission of a crime and he agreed to assist in the investigation and trial of this employee if required.

The opinion in *Palmateer* cites many authorities. We learn there-

from that there should be no cause of action for retaliatory discharge unless a clear mandate of public policy is involved. (85 Ill. 2d 124, 131.) In *Kelsay*, there was also a clear mandate of public policy in the direct language of the statute protecting employees from coercion against exercising their untrammeled right to proceed to obtain workmen's compensation. *Palmateer* and *Kelsay* are thus much stronger cases than the one at bar. The *Palmateer* complaint alleged the plaintiff was discharged for a clearly specified reason. In the case before us we have no discharge and no so-called "constructive" discharge.

In *Palmateer*, three justices dissented including the author of the *Kelsay* opinion. The dissent is best characterized as quite strong. The dissent recognized the possible danger inherent in an undue expansion of the availability of the tort of retaliatory discharge. However, in the case before us it cannot even be said that the record presents an extension of the tort. In the record before us we have no discharge of any kind and no connection with any violation of the Workmen's Compensation Act.

Several recent decisions should be noted simply for purpose of completeness. In *Robertson v. Travelers Insurance Co.* (1983), 95 Ill. 2d 441, plaintiff brought a common law action for the tort of "outrage." Involved in the case was a workmen's compensation action. A jury awarded plaintiff a large amount of compensatory and punitive damages. A divided appellate court affirmed. *Robertson v. Travelers Insurance co.* (1981), 100 Ill. App. 3d 845, 427 N.E.2d 302.

The supreme court reversed on the theory that "[a] common law action should not, without other evidence of legislative intent, be held to survive the [Workmen's Compensation] Act's exclusivity provisions merely because the remedy provided in the Act for the injury alleged applies to other kinds of injuries as well." (*Robertson v. Travelers Insurance Co.* (1983), 95 Ill. 2d 441, 447.) It seems to us that this opinion indicates an intention to avoid possible expansion of the cause of action involved in *Kelsay* and *Palmateer*.

In *Cook v. Caterpillar Tractor Co.* (1980), 85 Ill. App. 3d 402, 407 N.E.2d 95, *appeal denied* (1980), 81 Ill. 2d 601, a divided appellate court held that the tort of retaliatory discharge, as considered in *Kelsay*, should not be extended in view of the existence of a collective bargaining agreement between the parties. (85 Ill. App. 3d 402, 406.) The plaintiff there was discharged for the alleged reason of habitual tardiness or absence. The majority of the court held that plaintiff had failed to raise the issue of retaliatory discharge in his grievance procedures and therefore had failed to exhaust his remedies. The dissent pointed out that plaintiff had submitted to arbitration under the griev-

ance procedure prior to the *Kelsay* decision. 85 Ill. App. 3d 402, 409 (Barry, J., dissenting).

A slightly different situation arose in *Wyatt v. Jewel Companies, Inc.* (1982), 108 Ill. App. 3d 840, 439 N.E.2d 1053, *appeal denied* (1982), 92 Ill. 2d 573. There, the court was unanimous in holding that plaintiff need not exhaust available contractual remedies, including a collective bargaining agreement, before filing an action for retaliatory discharge under the authority of *Kelsay. Wyatt* has no application to the instant case. Plaintiff here engaged in an unsuccessful grievance proceeding, but as shown, that grievance was not directed to the alleged tort of retaliatory discharge as is plaintiff's complaint.

In the later case of *Suddreth v. Caterpillar Tractor Co.* (1983), 114 Ill. App. 3d 396, this court, after referring to *Deatrick v. Funk Seeds International* (1982), 109 Ill. App. 3d 998, 441 N.E.2d 669, and to *Wyatt*, held that where a collective bargaining agreement exists the employer does not have a complete right to discharge so that the policy which prompted the holding in *Kelsay* was not operative. The court thus affirmed dismissal of the complaint for retaliatory discharge.

Our analysis as above set forth convinces us that the judgment appealed from should be and it is therefore reversed.

Judgment reversed.

BUCKLEY, P.J., and McGLOON, J., concur.