Lawrence T. ZIELONKA, Plaintiff,

v.

Judy Baar TOPINKA, etc., Defendant.

No. 97 C 4462.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 28, 1998.

William J. Juneau and Dale A. DeLoriea, Hinsdale, IL, for Plaintiff.

Paula Giroux, Assistant Attorney General, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This case stems from the contentious working relationships among some high-level staff members in the office of Illinois State Treasurer Judy Baar Topinka ("Topinka") that culminated in the firing of Lawrence Zielonka ("Zielonka"). Zielonka's five-count Second Amended Complaint ("SAC") charges that his termination violated the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §§ 621–634), infringed his Fourteenth Amendment procedural due process rights in two ways and thus violated the Civil Rights Act of 1871 ("Section 1983," 42 U.S.C. § 1983), and amounted to a retaliatory discharge under the Illinois Whistle Blower Protection Act ("Whistle Blower Act," 5 ILCS 395/1) and under state common law. Zielonka seeks (1) injunctive relief or in the alternative prospective damages via his ADEA claim and (2) compensatory and punitive damages and (where applicable) attorneys' fees and costs on his other claims.

Topinka has now moved for summary judgment under Fed.R.Civ.P. 56 ("Rule 56") on all counts of the Complaint. Zielonka has filed a cross-motion for partial summary judgment on Complaint Count V, which advances a procedural due process violation based on Zielonka's assertion that he is an employee subject to the procedural protections of the State Treasurer Employment Code ("Employment Code," 15 ILCS 510/1 to 510/15).[1] Both parties have complied with this District Court's General Rules ("GR") 12(M) and 12(N),[2] which have been adopted to highlight the existence or nonexistence of any material factual disputes.

Each side's motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, Topinka's motion is granted in its entirety, causing dismissal of this action, while Zielonka's cross-motion is necessarily denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on each party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where cross-motions are involved, that calls for a dual perspective, and this opinion reflects that requirement where appropriate.

### Facts

During Topinka's 1994 campaign for Illinois State Treasurer, Zielonka volunteered to help with research on various policy issues connected with the campaign (T. 12(M) ¶ 3, Z. 12(N) ¶ 4). One of Topinka's campaign pledges was to create an Inspector General position in the Treasurer's Office to deter

---

1. Each statutory citation other than references to Section 1983 will take the form of the shorthand definition in this or the preceding paragraph of the text followed by " § " and the section number in the statutory title. As to the two Illinois statutes, "5 ILCS" and "15 ILCS" will be omitted as unnecessarily repetitive.

2. This opinion refers to Topinka's GR 12(M) statement as "T. 12(M) ¶—" and to Zielonka's GR 12(M) statement as "Z. 12(M) ¶—." Those same letter abbreviations ("T." and "Z.") are used to refer to the parties' other filings.

fraud, waste, mismanagement and other abuses (T. 12(M) ¶ 7). Zielonka states that Topinka's campaign manager Martin Kovarik ("Kovarik") had promised him he would eventually fill that Inspector General post (Z.12(N) ¶ 9), while Topinka says Zielonka was never a candidate for the position (T. 12(M) ¶ 9).[3] In any event, after Topinka was elected Zielonka became the Deputy Inspector General in her office (*id.* ¶ 9).

In late 1995 Zielonka and Jack Lanigan ("Lanigan"), who had been appointed Inspector General, issued a report about the overall operations of the Office, as requested by Topinka when she took office (*id.* ¶¶ 10–11). That report criticized the management style of Kovarik, who had been appointed Topinka's Deputy Treasurer (*id.* ¶¶ 5, 13), and its issuance resulted in an angry confrontation between Kovarik and either Zielonka or Lanigan (*id.* ¶ 14; Z. Ex. 2 ¶ 12). Few copies of the report were made, and it was not issued publicly (T. 12(M) ¶ 15, Z. 12(N) ¶ 15).

Kovarik resigned in December 1995 because of adverse publicity related to federal tax liability problems (T. 12(M) ¶ 19), and Topinka appointed James Stapleton ("Stapleton") to the Chief of Staff position to take over Kovarik's duties (*id.* ¶ 20). In that same month Lanigan retired as Inspector General (*id.* ¶ 18).

In February 1996 Zielonka (still Deputy Inspector General, T.Ex. 6) reported to Topinka on allegations of sexual harassment and other misconduct by Treasurer employee Gary Marschke ("Marschke") (*id.* ¶ 46).[4] At that time Topinka had already initiated an investigation into Marschke's behavior, so she did not believe Zielonka needed to get involved (*id.* ¶¶ 45, 49). Marschke was disciplined on February 26 and ultimately resigned (*id.* ¶ 48).

On March 16 Topinka hired Robert Steere ("Steere") as the new Inspector General and reassigned Zielonka to become Director of Planning, Research and Compliance, a position created specifically for Zielonka (*id.* ¶¶ 28, 37). Steere was then 41 years old and Zielonka was 53 (*id.* ¶ 110). When Steere was appointed, Topinka and Stapleton eliminated the position of Deputy Inspector General because they believed there was not enough work to justify both an Inspector General and a Deputy (*id.* ¶ 31). Zielonka's responsibilities in his new position included providing information to the Treasurer on financial issues, developing a strategic plan and researching linked-deposit loans[5] made by the Treasurer's Office (*id.* ¶¶ 38–40; Z. 12(N) ¶ 40). Zielonka reported directly to Stapleton (T. Ex. 3 ¶ 29).

In June a secretary told Zielonka that the Treasurer's chief legal counsel had threatened to shoot another attorney in the Office (T. 12(M) ¶ 54). Zielonka spoke to the lawyer who had been threatened, and upon hearing that the lawyer had been "a bit unnerved" by the incident, he immediately interrupted a meeting to inform Topinka and Stapleton about it (*id.* ¶¶ 56–58; Z. 12(N) ¶ 57). They soon discovered that the threat had been made at least a month earlier (T. 12(M) ¶ 60). Afterward Topinka told Zielonka not to report such incidents without first pursuing some further investigation (*id.* ¶ 60a).

In late July Zielonka went to Springfield to meet with other directors regarding the strategic plan he was developing. During that visit Zielonka had extremely contentious discussions with at least three high-level employees (*id.* ¶¶ 63–75). One of those employees, Director of Personnel Keith Albrecht ("Albrecht"), called Topinka and Stapleton on July 26 to report that Zielonka had been confrontational during his visit to the Springfield office (*id.* ¶¶ 76, 79). Topinka directed Stapleton to investigate and "write up" Zielonka if the allegations were true (*id.* ¶ 78).

---

**3.** For the reason stated in the preceding section, Zielonka's version prevails here, but it makes no difference.

**4.** Because all of the remaining operative events except the filing of this lawsuit also took place in 1996, that year reference will be omitted hereafter.

**5.** Such a "linked deposit" is a transaction in which the Treasurer deposits state money in a financial institution at a reduced interest rate if the financial institution agrees to lend the money to an entity that will use it for economic or social community development purposes (T. 12(M) ¶ 80).

Just a few days later Zielonka sent a memorandum to Topinka and Stapleton regarding a linked-deposit loan to Aunt Martha's Youth Service Center, a social service agency (*id.* ¶ 87). That memorandum reaffirmed his concerns, expressed orally a few weeks earlier, that there were various deficiencies in the documentation of the loan, particularly with regard to its purpose (*id.* 85; Z. 12(N) ¶ 86). That loan was the first of its kind to a social service agency, all prior loans having been directed to economic development projects (T. 12(M) ¶ 86).

On August 2, less than a week after Topinka and Stapleton had received the reports as to Zielonka's disruptive conduct during the Springfield meetings, they decided to terminate Zielonka and eliminate his position (*id.* ¶ 100). Their asserted reasons were (1) his confrontational and overbearing personality and (2) substantial budgetary issues in the Treasurer's Office that made the $50,000 saving in salary expense significant (*id.* ¶¶ 101–02). Upon Zielonka's departure Topinka nevertheless signed a very favorable letter of recommendation (Z.12(N) ¶ 101, T. 12(N) ¶¶ 33–40).

### Age Discrimination Claim

Zielonka first contends in SAC Count I that he was not promoted to the position of Inspector General and was ultimately fired because of his age, thus violating ADEA. Born on March 21, 1942, Zielonka was 53 when he was passed over for Inspector General and 54 when he was fired (T.Ex. 8).

Count I calls for application of the general summary judgment standard "with added rigor," because "intent is inevitably the central issue" in employment discrimination cases (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.

1992)). That does not negate the potential for summary judgment in cases where a movant plainly satisfies Rule 56 standards. In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Zielonka was treated in a statutorily prohibited discriminatory fashion (see *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there). As the ensuing discussion demonstrates, that standard dooms Zielonka's claim. No reasonable jury could find that Zielonka was treated adversely because of his age.

Age discrimination can be established in one of two ways: with direct or circumstantial evidence that the adverse employment actions would not have been taken but for plaintiff's age (the so-called direct method), or with the burden-shifting and inference-creating method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (the so-called indirect method). Here Zielonka presents no direct evidence of discrimination, attempting instead to create the inference of discrimination [6] only through the indirect method.

Under that approach Zielonka must establish a prima facie case by demonstrating that (1) he was a member of the protected class (age 40 or over), (2) he was performing his job to his employer's legitimate expectations, (3) he was subjected to an adverse employment decision and (4) younger, similarly situated employees were treated more favorably [7] (*Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir.1998)). If he can demonstrate his prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to Topinka to

---

**6.** In the summary judgment context, of course, Zielonka's burden is only that of creating reasonable inferences, not one of proof as such (see, e.g., *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the case law speaks of what an employee must "prove" or "show." Accordingly, whenever this opinion employs such terms it should be understood as meaning Zielonka's lesser burden of creating reasonable inferences, not his actually bearing the burden of persua-

sion. That inference-creating burden is the test that this Court has in fact used throughout this opinion.

**7.** As to that fourth requirement, it is presumed that the fourth prong has been met if favored employees are more than 10 years younger than plaintiff regardless of whether the favored employees are themselves within the statutorily age-protected class (see *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir.1997)).

articulate some non-discriminatory reason for her actions (*id.*). If she does that the presumption dissolves, and Zielonka must establish that Topinka's asserted reason was pretextual (*id.*).

Zielonka clearly meets the first and third requirements of his prima facie case on both the failure to promote and the firing allegations: He was older than 40 and faced adverse employment decisions. But those facts take him only so far. Those two adverse employment actions will be considered in turn.

First, in early 1996 Zielonka was passed over for the Inspector General position after Lanigan retired—Topinka hired Steere instead. Because Steere was 41 at the time (more than 10 years Zielonka's junior), that meets the fourth component of the prima facie case under the teaching of *Hartley*, 124 F.3d at 892–93. But Zielonka has produced no evidence to generate a reasonable inference that Topinka's reason for not promoting him was a mere pretext.

Topinka says that she did not offer the Inspector General position to Zielonka because he did not have the required "people skills" to be effective in that position, as did Steere (T. 12(M) ¶ 23). According to *McCoy*, 957 F.2d at 373, quoted again in *Richter*, 142 F.3d at 1029:

[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.

Zielonka must therefore present evidence at least implying that Topinka did not honestly believe that Steere was the more qualified candidate with the requisite interpersonal skills needed for the job. That he has not done.

■ In fact, Zielonka has admitted that Topinka received reports from Stapleton and other Treasurer's Office employees that Topinka was "overbearing and even verbally abusive in his dealings with them as Deputy Inspector General" (T. 12(M) ¶ 24; Z. 12(N) ¶ 24). Zielonka does deny that he was confrontational and that he lacked tact and di-

plomacy (Z.12(N) ¶¶ 25, 27), and he points out that outgoing Inspector General Lanigan regarded him highly (*id.* ¶ 27). But as *Kuhn v. Ball State University*, 78 F.3d 330, 332 (7th Cir.1996) has observed:

The ADEA is not a merit-selection program. Employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter.

Hence Zielonka's own statements about his qualifications, even when added to Lanigan's praise for him (Z.Ex.2), do not support the necessary inference that Zielonka was so much more qualified than Steere that Topinka could not honestly have believed Steere the better candidate and so must have discriminated in her decision (see *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir.1996), denying a discrimination claim because the record did not support the allegation that plaintiff was so much more qualified that discrimination must have played a role in the failure to promote him).

Additional evidence further supports the established conclusion that Topinka would have taken the same action were Zielonka not a member of a statutorily protected class. Lanigan himself was 60 years old when Topinka appointed him as the first Inspector General (T. 12(M) ¶ 110). When Topinka initially hired Zielonka to be the Deputy Inspector General, Zielonka was 52. According to *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 923–24 (7th Cir.1996), the fact that the complaining employee was initially hired when he was well into the protected age class, "although not conclusive, is somewhat indicative of [the employer's] lack of discriminatory intent" in later adverse actions. Moreover, Topinka herself (born on January 16, 1944, Z. Ex. 4 at 4) is only two years younger than Zielonka. That she too was well into the protected class throughout the decision-making process is also a significant factor in evaluating the discrimination claim (see *Richter*, 142 F.3d at 1032). Nor can Zielonka explain away the strongly counter-intuitive nature of his contention that an employee who was first hired when he was

already age 53, and whose total job tenure ran something under 1 1/2 years until terminated by the selfsame decisionmaker, was somehow a victim of *age* discrimination. Taking all the evidence into account, this Court holds that no reasonable juror could find that Topinka's non-promotion of Zielonka was due to his age.

■ For his other ADEA claim, Zielonka points to his August 1996 firing at age 54. At that time, Stapleton told him that he needed to work on his interpersonal skills (T. 12(M) 104). Again Zielonka maintains he was mistreated because of his age.

In this instance even Zielonka's prima facie case is in doubt because of his failure to show that similarly situated younger employees were treated more favorably than he was. That would require some showing that other employees with similar "people skills" deficiencies were not fired. Zielonka attempts to identify two examples of such employees: former Deputy Treasurer Kovarik and Personnel Director Albrecht. Kovarik may have been "boorish, insulting and abusive" as asserted by Zielonka (P. Mem.10), but he was 62 when he resigned his position in the Treasurer's Office—not fired. As for Albrecht, who was in his early 40s (significantly younger than Zielonka), Zielonka asserts without evidentiary support that Albrecht was "notorious for his tantrums" (P. Mem.10). That naked statement cannot of course take the place of evidence—but even if it were to be taken into account (as Rule 56(e) forbids), it would still not suffice to create the necessary inference that Topinka's reasons for terminating Zielonka were pretextual.

As her reasons for Zielonka's firing, Topinka provides an explanation much akin to what caused her not to promote him: His confrontational behavior was becoming detrimental to the operation of the Treasurer's Office. After Zielonka's late July 1996 trip to the Springfield office, Topinka received information about various confrontational meetings and heated discussions that had marked the trip. Zielonka acknowledged that several of those meetings were quite contentious. In response to the negative reports about the trip, Topinka directed Stapleton to investigate, noting in an e-mail that

Zielonka had "once again, used poor judgment" (T.Ex. 5 at 25). On the face of things, then, Topinka has advanced a good-faith belief that Zielonka was overly confrontational and was causing unnecessary disruptions. And she adds that Zielonka's duties as Director of Planning, Research and Compliance could be reassigned to existing staff members to save money, particularly considering that she had created the position only a few months before (and specifically for Zielonka).

Zielonka responds by claiming "that Topinka had embarked on a campaign to eliminate older employees" (P. Mem.12). Although the parties dispute whether employees who were terminated around that time were replaced by younger employees (and it may be noted that some replacements moved in the other direction), even a couple of examples to that effect would not aid Zielonka. Mere anecdotal evidence as to assertedly comparable cases is not enough to raise an inference of discrimination (see the aphorism in *Kuhn,* 78 F.3d at 332 that "One is an anecdote, and several cases are several anecdotes").

In sum, Zielonka has produced no evidence that, even through a chain of reasonable inferences, can transform Topinka's stated explanations into mere pretexts for discrimination. Topinka's motion for summary judgment is therefore granted as to the Count I ADEA claim.

*Procedural Due Process Claim*

Zielonka presents two counts alleging procedural due process violations:

1. SAC Count II asserts that he entered into an implied employment contract with Topinka that created a property interest in his job at the Treasurer's Office.

2. SAC Count V contends that he was an employee subject to the Employment Code and as such was guaranteed certain procedural rights.

While only Topinka has moved for summary judgment as to Count II, the parties have filed cross-motions for summary judgment as to Count V. This opinion will consider those procedural due process claims in turn.

*Count II Implied Contract Claim*

For Zielonka to raise a successful procedural due process claim, he must first demonstrate a liberty or property interest within the protection of the Due Process Clause. Count II is based on the notion that he had such a property interest in continued employment in the Treasurer's Office during Topinka's term.

■ Property interests "are created and their dimensions are defined by existing rules·or understandings that stem from an independent source such as state law" (*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). As *Farmer v. Lane*, 864 F.2d 473, 478 (7th Cir.1988) has explained (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701):

> Property interests in employment may be created by express or implied contracts, municipal ordinances or state laws—including those "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

Here Zielonka argues that his protected property interest arises from an implied contract—a "mutually explicit understanding[ ] that support[s] his claim of entitlement" (*Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). To examine that premise, this Court turns to Illinois law.

■ Illinois public employees presumptively have no property interest in their positions (see *Domiano v. Village of River Grove*, 904 F.2d 1142, 1147 (7th Cir.1990), citing Illinois cases). Instead they are presumed to be at-will employees who can be fired at any time for any reason (*Corcoran v. Chicago Park Dist.*, 875 F.2d 609, 612 (7th Cir.1989), citing *Martin v. Federal Life Ins. Co.*, 109 Ill.App.3d 596, 600, 65 Ill.Dec. 143, 440 N.E.2d 998, 1002 (1st Dist.1982)). Although explicit or implied contracts for continued employment can rebut that presumption, to that end they must meet the basic contract requirements: offer, acceptance and consid-

eration (see *Corcoran*, 875 F.2d at 612). Furthermore, oral employment contracts are viewed skeptically in Illinois (see *Milazzo v. O'Connell*, 925 F.Supp. 1331, 1340 (N.D.Ill. 1996) (citing *Smith v. Board of Educ.*, 708 F.2d 258, 263 (7th Cir.1983)), *aff'd on other grounds*, 108 F.3d 129 (7th Cir.1997)). State law is not on Zielonka's side.

■ About a year ago this Court rejected a motion to dismiss this claim as a pleading matter, observing that Zielonka might support through discovery his allegations that oral promises and appointments to Treasurer's Office positions carried with them "the implied obligation not to terminate him without cause" (1997 WL 781721 (N.D.Ill. Dec.3,1997)). But Zielonka's GR 12(N) statement identifies no evidence even suggesting that anyone assured him that he was guaranteed *continued* employment. Even if Topinka, Kovarik or Stapleton specifically offered the Inspector General position to Zielonka (which Topinka disputes), Zielonka does not say that any of them indicated—through words or otherwise—that he. would not be terminated during Topinka's term of office.[8]

Especially in light of the Illinois courts' hostility toward creating property interests in employment and their skeptical view of oral contracts, no implied contract can reasonably be inferred from the evidence presented. Because Zielonka cannot create even a marginal inference that an implied contract created a protected property interest in his continued employment, Topinka also succeeds on her motion for summary judgment as to SAC Count II.

*Count V Employment Code Claim*

Zielonka's second procedural due process argument is grounded in his claim that he was entitled to the benefit of the Employment Code, which provides specific procedural safeguards for employees facing adverse employment actions. Because Zielonka undisputably did not receive the process specified in the Code, the parties debate whether

---

**8.** Zielonka does argue that Topinka's public announcement of Zielonka's appointment as Deputy Inspector General lends credence to his claim that she was obligated to keep him on through-

out her term (P. Mem.13). But changes in political staff positions during the tenure of public officials are far too common to lend credit to that unsupported assertion.

Zielonka's position was subject to the Code in the first place.

As indicated earlier in this opinion, the submission of the litigants' cross-motions for summary judgment mandates the adoption of a dual perspective of the facts—an approach that can sometimes force the denial of both motions. That potential does not arise here because the essential underlying facts are not in dispute. This claim turns instead on a legal issue: whether Zielonka was exempt from the Employment Code.

Code § 5a exempts four groups of employees:

(a) The Deputy State Treasurer, Assistant to the State Treasurer, Executive Assistant to the State Treasurer and Chief Fiscal Officer;

(b) The personal secretaries and administrative assistants to the Treasurer;

(c) Persons exercising substantial executive or administrative functions who have, as their primary responsibility, the operation of an organizational entity in the Office of the State Treasurer;

(d) Licensed attorneys in positions as legal or technical advisors, except in those positions paid from federal funds if such exemption is inconsistent with federal requirements.

Topinka claims that Zielonka is exempt because he falls within Code § 5a(c). No Illinois court has yet interpreted that section, so this Court must do its best without their guidance.

■ Neither party disputes that during Zielonka's employment he was considered a "non-Code" employee exempt from the statute. Zielonka's payroll records specifically state that he was a non-Code employee (T. 12(N) Ex. C). Nor was Zielonka treated as subject to the extensive rules and regulations regarding Treasurer employees (see 80 Ill.

Adm.Code Subt. B, Ch. IV)—for example, he did not take an examination before he was hired, as Code applicants are required to do (see 80 Ill.Adm.Code § 620.110). *Howard v. County of Cook,* 145 Ill.App.3d 538, 542, 99 Ill.Dec. 431, 495 N.E.2d 1166, 1169–70 (1st Dist.1986) expressly found an employee was not a civil service employee entitled to receive the statutory discharge procedure, based in part on her admission that she and her agency had not previously followed civil service requirements for hiring and promotions. In the same way, because Zielonka did not have to bear the initial burdens of Code employees, he now has a difficult time claiming the benefit of Code status.

That result is buttressed by the language of the Code itself. To be exempt under Code § 5a(c), Zielonka must have exercised "substantial executive or administrative functions" and have as his primary responsibility "the operation of an organizational entity in the Office of the State Treasurer." Zielonka's duties as Director of Planning, Research and Compliance included researching important issues and developing a strategic plan for the Office. Although Zielonka attempts to characterize his work as virtually clerical, that self-serving characterization is belied by the just-described responsibility, whose discharge clearly demanded extensive analysis that could have a significant impact on the Office—by definition "substantial executive or administrative functions."[9] On another aspect of the matter, while Zielonka had direct supervision over only one employee, the Treasurer's Office management chart shows that his position was on a par with the directorates of other important divisions, such as Personnel and Governmental Affairs (T. 12(N) Ex. B). It must be concluded as a matter of law that Zielonka held the type of high-level, influential executive position that the General Assembly meant to exclude from the Code's coverage.

9. It is not unduly cynical to suggest that if Zielonka had not been fired and if the current question had been (say) the type of letter of recommendation to be sent to a prospective employer in conjunction with Zielonka's application for a responsible new position, he would have kicked like the proverbial wounded steer if that letter of recommendation had negated (or even downplayed) his performance of "substantial executive

or administrative functions" while in the Treasurer's Office. Indeed, the letter that Zielonka himself drafted for use as a letter of recommendation after his termination was so totally at odds with his present attempt to denigrate his duties—a letter that was highly (and accurately) expansive in emphasizing his job responsibilities—as to question the good faith of his current opportunistic stance.

Because Zielonka was thus not subject to the Employment Code, he was not entitled to its procedural safeguards and hence cannot claim that his procedural due process rights were violated. Topinka's motion for summary judgment as to Count V is granted, while Zielonka's is denied.

### State Law Retaliatory Discharge Claims

Zielonka's final claims urge that he was not promoted and that he was ultimately discharged in retaliation for his involvement in four events: (1) issuing the 1995 Inspector General's Report, (2) reporting the Marschke sexual harassment information, (3) providing information about the shooting threat made by the chief legal counsel and (4) suggesting that the Aunt Martha's linked-loan deposit needed improved documentation.[10] SAC Counts III and IV (the latter simply incorporates the former) allege that he was not promoted to Inspector General because of the first two episodes, and that he was fired because of the second two. That, Zielonka says, violated both the Whistle Blower Act and the Illinois common law tort of retaliatory discharge (Count IV).

### Whistle Blower Act Claim

Whistle Blower Act § 395/1 states in relevant part:

(a) In any case involving any disclosure of information by an employee of any Constitutional Officer of this State which the employee reasonably believes evidences (1) a violation of any law, rule or regulation or (2) mismanagement, a gross waste of funds, abuse of authority or a substantial and specific danger to public health or safety if the disclosure is not specifically prohibited by law, . . . .

(b) No disciplinary action shall be taken against any employee for the disclosure of any alleged prohibited activity under investigation or for any related activity.

Because no state court decision has offered any interpretation of the statute relevant to Zielonka's claim, this opinion looks to the statutory language to see whether a jury could draw a reasonable inference that Topinka has violated the statute. Each of the four incidents will be addressed in turn.

■ As for Zielonka's contention that he was not promoted because of his role in writing the Inspector General's Report, which criticized Kovarik's management style, it is more than questionable whether that type of critique constitutes disclosure of "mismanagement" or like misfeasance or malfeasance as set out in the statute. But even if that were the case, Zielonka provides no basis for inferring a causal relationship between his role in drafting the report and Topinka's failure to promote him. As Zielonka admits, Topinka agreed with and acted on several of the suggestions made in the report (Z.12(N) ¶ 13). And when she hired Steere instead of Zielonka as the new Inspector General (for which she provided several facially legitimate reasons), she kept Zielonka on by developing a new position within the Office expressly for him. All those facts support Topinka's assertion that she did not retaliate against Zielonka for his role in the Inspector General's Report.

■ Next Zielonka claims that his reporting of the Marschke sexual harassment incident led to his failure to be promoted. Even if it were to be assumed that Zielonka disclosed information that Topinka did not already have and that the information fell within the ambit of the whistle blower statute, the sequence of events shows beyond dispute that such disclosure could not have caused Topinka's nonpromotion of Zielonka.

---

**10.** Zielonka alleges in his summary judgment memorandum (though not at all in the SAC) that his reporting of a document-shredding incident involving Kovarik also contributed to the adverse employment actions against him. While its omission from the SAC alone would not prevent Zielonka from relying on that matter, Zielonka also made no reference at all to the shredding incident in his deposition testimony, despite being asked expressly whether any event other than the four discussed here had led to the claimed retaliation (T. Ex. 1 at 39, 42–44). Instead Ziel-

onka first raised the shredding incident only in his affidavit in response to Topinka's current motion, a document signed several months after the deposition (Z. Ex. 1 ¶ 26). Zielonka cannot create an issue of fact in that way, for "a deposition is the time for the plaintiff to make a record capable of surviving summary judgment—not a later filed affidavit" (*Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 756 (7th Cir.1998)). Consequently the alleged shredding incident will not be considered in evaluating Zielonka's retaliatory discharge claims.

Because Zielonka admits that Topinka had already decided to appoint Steere before Zielonka wrote her about the Marschke incident (T. 12(M) ¶ 50; Z. 12(N) ¶ 50), by definition that incident cannot have played a role in the appointment (and nonpromotion decision).[11]

■ Third, Zielonka's argument that his reporting of the chief counsel's threat to shoot another attorney led to his dismissal does not qualify as an actionable claim under the Whistle Blower Act. Moreover, Zielonka has presented no factual basis for finding a causal link between the two events—though the three months that passed between the incident and Zielonka's termination may not quite fail the presumptive attenuation addressed in such cases as *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) and the earlier cases discussed there,[12] the passage of time plus the absence of *any* evidence to suggest a causal nexus dooms Zielonka's reliance on that incident.[13] Indeed, the contrast between (1) the time intervals that separated each of the incidents to which Zielonka points from his termination date and (2) the period of just a few days that passed between Zielonka's final confrontational performance in Springfield and the decision to fire him strongly buttresses Topinka's statement that it was the latter occurrence and not at all the former factors that triggered the termination decision.

■ Zielonka's final claim, based on his advising Topinka and Stapleton that the Aunt Martha's linked-loan deposit needed better documentation, did not pose a whistle blowing incident alleging a "gross waste of

funds" or even "mismanagement" (Whistle Blower Act § 395/1(a)(2)). Ensuring that such documentation was complete was one of Zielonka's job duties. Further, Zielonka did not say that the Aunt Martha's loan should not have been made in the first place or was somehow improper. Rather he simply urged that the documentation be improved, particularly given that the loan's purpose was somewhat novel. Zielonka's critique of the Aunt Martha's loan therefore does not constitute whistle blowing.

Zielonka has fallen at every step of the way on his claim under the Whistle Blower Act. Again Topinka succeeds on her summary judgment motion—this time as to SAC Count III.

*Common Law Tort Claim*

Zielonka fares no better on SAC Count IV. In that respect Illinois courts recognize a very narrowly defined tort of retaliatory discharge as an exception to the general rule that an employer can fire an at-will employee at any time for any reason (*Fellhauer v. City of Geneva*, 142 Ill.2d 495, 505, 154 Ill.Dec. 649, 568 N.E.2d 870, 875 (1991)).

■ To state such a valid claim, "an employee must show he was dismissed in retaliation for his activities [the causation test], and that the dismissal was in contravention of a clearly mandated public policy" (*id.*). Under Illinois law such a public policy violation occurs only in two circumstances: when an employee was discharged in retaliation for filing a worker's compensation claim (*Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978)) and when an

---

**11.** Zielonka's SAC quite specifically alleged that he was *not promoted* because of those first two incidents and that he was *fired* because of the remaining two incidents, which will be addressed next. When it then became time to address matters in the context of summary judgment, however, Zielonka's responsive memorandum merged the arguments and appears to contend that all four episodes contributed to his termination. For the same reasons that Zielonka has been unable to show that the Inspector General's Report led to Topinka's failure to promote him, he also cannot demonstrate that it caused his termination many months later. As for the Marschke incident, the time lapse factor referred to later in the text knocks it out as a predicate for an allegedly retaliatory firing.

**12.** This Court of course recognizes that those cases deal with retaliation claims under federal law, while what are now at issue are like claims under Illinois law. Yet the principle established by those cases has obvious relevance here, for the precise issue at hand—the inferential effect (or lack of it) of several months' elapsed time between a plaintiff's actions and an assertedly retaliatory response—is identical to that addressed in the cited cases.

**13.** As indicated earlier, the Marschke situation (involving a six-month interval before Zielonka's firing) does flat-out flunk the standard suggested by those authorities.

employee was discharged for reporting illegal or improper conduct (*Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981)).[14]

 Here Zielonka asserts that he was discharged for reporting various instances of illegal or improper conduct. As to the first three matters that he advances, the same reasons that defeated the statutory whistle-blower claim are equally operative as to his putative common law claim. And as for the fourth episode (the Aunt Martha's loan), it simply does not fit within the narrow boundaries marked out by the Illinois cases (see *Fellhauer*, 142 Ill.2d at 508, 154 Ill.Dec. 649, 568 N.E.2d at 876).

It is not the role of this federal court to expand state law in such circumstances (see, e.g., *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987)), and Zielonka has provided no reason to do so here. Topinka's motion for summary judgment as to SAC Count IV is also granted.

### Conclusion

Topinka's summary judgment motion succeeds for a host of reasons discussed in this opinion. Zielonka may well believe that he was treated unfairly by Topinka and Stapleton, but he cannot prove that such treatment was illegal. There is no genuine issue of material fact, and Topinka is entitled to a judgment as a matter of law on all five of Zielonka's claims. This action is dismissed with prejudice.

---

**14.** In a further demonstration of the tort's limited scope, the Illinois Supreme Court has further confined such claims to situations in which the employee was actually terminated—it is not enough to show that the employee faced lesser adverse employment action (*Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill.2d 29, 39, 206 Ill.Dec. 625, 645 N.E.2d 877, 882 (1994)). So Zielonka's common law claim must look only to his firing, not his earlier nonpromotion.