NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 3, 2011
Decided July 25, 2011

**Before**

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

WILLIAM M. CONLEY, *District Judge*[*]

| | |
|---|---|
| No. 10-3207 | Appeal from the United States District Court for the |
| SHAUNA D. NELSON, | Northern District of Illinois, |
|     *Plaintiff-Appellant*, | Eastern Division. |
| | |
|     *v.* | No. 1:08-cv-05219 |
| | |
| REALTY CONSULTING SERVICES, INCORPORATED, | Robert W. Gettleman, *Judge*. |
|     *Defendant-Appellee*. | |

**O R D E R**

Shauna Nelson was a property manager for Greenbriar Apartments, a 135-unit apartment complex in Indiana, owned by Realty Consulting Services, Inc. ("Realty"). Realty is a property management company incorporated in Illinois and operating in both Illinois

---

[*] The Honorable William M. Conley, United States District Court for the Western District of Wisconsin, sitting by designation.

and Indiana (Greenbriar is Realty's only property in Indiana). Lawrence Irwin is the owner and president of Realty, and his daughter, Shane Adams, is the director of operations. Irwin's assistant, Mary Graffeo, is responsible for payroll. Nelson was hired in 2004 as a leasing consultant, then was promoted to property manager, the position she held until she was fired in 2007. As Greenbriar's property manager, Nelson was responsible for day-to-day operations and she supervised Greenbriar's leasing, maintenance, and janitorial personnel.

In June 2006, Nelson suggested to Adams that Greenbriar could use a full-time janitorial worker, or "cleaner," as it didn't have one. She further suggested that her husband, Victor Nelson, would like the position. But all was not a sea of tranquility between them: Shauna and Victor had a tumultuous relationship, and had, in fact, been divorced at one point for about 12 days before getting remarried. Despite the old adage about working with friends or family members, Adams hired Victor as a direct report to Nelson. Nelson claims that during his employment interview Victor asked if his pay would be at least $10 an hour, and Adams responded, "We're going to start you out around 24 [thousand dollars]." Adams contends that everyone agreed to Victor's actual starting rate of $10 an hour, with a review after 90 days to see if things were working out. In October 2006, Victor's pay was raised to $24,000 per year. After another 90 days or so, it was raised again, to $26,000, at the request of Nelson who felt that the work Victor was doing, which included some light maintenance, merited the bump.

In May 2007, a "maintenance marathon" (an event where major maintenance is done to improve a given property and workers who participate are paid overtime) was held at one of Realty's properties. Nelson claims she asked Adams if Victor could work the marathon and that Adams said no because marathons were restricted to maintenance workers, and Victor was a cleaner. Adams says no one ever asked her if Victor could work the marathon. Among the Realty personnel who did work the marathon was a Hispanic cleaner employed at a Realty property in Illinois.

In early July 2007, Victor called Adams and asked if he could be transferred to another property because he and Nelson were fighting, and he no longer wanted to work for her. Adams checked, but she didn't have an opening for Victor at any other property. Victor resigned on July 9, 2007, and Adams offered to provide him with a reference. On the same day, Victor moved out of the house he shared with Nelson and into his grandmother's home.

Two days after Victor quit, Nelson learned that the Hispanic cleaner who had worked the May 2007 maintenance marathon had just received a raise to $28,000. Nelson admitted at her deposition that she does not know how many units are in the property where the Hispanic cleaner works, nor is she aware of what this cleaner's background is,

how long he's been with the company, or what his job responsibilities are. Boiled down, she simply knows that he's Hispanic, he's a cleaner, and he received a raise to $28,000 a year around the time that Victor quit.

On July 20, Victor called Realty's corporate office. Graffeo answered the phone, and Victor proceeded to berate her. Graffeo passed the call to Adams who asked Victor not to call again. Adams then emailed Nelson to let her know about these conversations and that she'd told Victor not to call again. Nelson responded that she was "totally floored," saying, "I'm sorry you'll [sic] had to encounter an unpleasant conversation I can only imagine."

In late July or early August 2007, Nelson recommended that Adams hire Joshua Miller to replace Victor. Adams started Miller, who like Victor is African-American, at $26,000 a year—the amount Victor had been making when he quit—because she felt history had shown that the property could support a cleaner's salary at that level. A few days after he was hired, Nelson sent Adams an email complaining that Miller was starting at Victor's ending pay rate. Adams asked Nelson to call her, and the two got into an argument on the phone. Nelson says that, although she was angry, she didn't raise her voice during this argument and that Adams yelled at her. Adams says she and Nelson yelled at each other. Nelson did not mention the Hispanic cleaner during this conversation—she complained only about Miller's pay in comparison to Victor's.

On August 7, Nelson says she accompanied Victor to the Gary Human Rights Commission so he could file a charge of discrimination. The charge was submitted on August 14, and in it Victor claimed he learned on July 11, 2007, (after his resignation) that a Hispanic cleaner at another property was making more than he had.[1] He also claimed that Adams denied him the opportunity to work the maintenance marathon and misrepresented his salary on corporation papers.[2] In his charge, Victor stated that he resigned because he was denied the wages afforded to others performing the same job, and he believed he was discriminated against based on his race and religion.

On August 15, the day after Victor submitted his charge, Nelson went to a manager's

---

[1] There is some ambiguity as to whether Victor actually resigned on July 9 or July 10 (he stated July 10 in his discrimination charge). Regardless, neither Nelson nor Victor claims that they were aware of what the Hispanic cleaner was making until after Victor's resignation.

[2] The paper in question appears to be a sheet on which someone had noted salaries for current employees that Adams brought with her to a meeting at Greenbrier to discuss compensation and raises. On it Victor's salary is typed in as $25,000 and crossed out, with $26,000 handwritten next to it. It's not clear who typed up this sheet, and no one contends that the sheet was used for any reason other than this meeting. Nor does anyone contend that Victor was actually ever paid $25,000.

meeting at the corporate office in Inverness, Illinois.  At the meeting she introduced herself as the "black sheep" of Realty.  Adams claims that Nelson was also verbally combative throughout the meeting and argumentative in trying to get her points across.  Nelson claims that after Adams was dismissive of a comment she made, she barely spoke for the remainder of the meeting.

On August 16, the Equal Employment Opportunity Commission's ("EEOC") Indianapolis District Office received Victor's charge, and it issued a notice of a charge of discrimination the next day.  Realty learned of the charge somewhere between August 17 and August 21, when Graffeo called Nelson and asked that she fill out a "Termination Description Form" for Victor.  This form documents the employee's name, job description, start and end dates, ending salary, and health insurance status, and has an area for an explanation of the circumstances of termination.  Nelson protested, asking why the form was needed since Victor had resigned six weeks earlier and wasn't fired.  Graffeo said it was needed simply to close out Victor's file and was standard operating procedure, regardless of whether a person quit or was fired.  She told Nelson to fill out the form however she wanted.  Nelson refused because, she claims, she felt Graffeo was asking her to falsify records in preparation for a response to the EEOC charge.  Nelson told Graffeo she had never done this before for an employee who quit and said she wasn't going to fill out the form.  Graffeo responded that she wasn't going to argue with Nelson and that Nelson should just fill out the form and send it over.  Graffeo told Irwin and Adams that Nelson refused to complete the form.  However, Nelson did, in fact, complete the form that day, and wrote in the explanation of termination section:

> I don't have an explanation for the description of termination, because Victor wasn't terminated he resigned.  I was called by Mary Graffeo requesting this form 8-21-07 but I explained to her that I've never filled one out before for any other employee who resigned only those who were terminated.  In obediance [sic] to what I've been asked to do from Mary (Corporate) I have complied in filling out this form.

On August 22, Adams and Irwin went to Greenbriar to fire Nelson.  Adams and Irwin say that, given the recent incidents, they felt they could no longer trust Nelson's judgment and could not have her managing a property remote from the corporate office.  Nelson says they gave her no explanation for her termination, but that Irwin just told her it was time to part ways and offered to provide a reference.

Nelson claims she was fired in retaliation for assisting Victor with his EEOC charge, so she filed her own EEOC charge, as well as this suit against Realty, alleging one count each of retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  She also alleges one count of common law retaliatory discharge under Illinois law, on

the theory that she was retaliated against for refusing to participate in an activity which violated federal law (namely, her reluctance to fill out the Termination Description Form, which she characterizes as refusing to lie to a federal agency). The district judge granted summary judgment to Realty on the federal claims, finding that, even viewing the facts in her favor, Nelson could not have had a good faith belief in the validity of Victor's EEOC charge, and therefore her participation in filing it was not a protected activity under Title VII and § 1981. He further granted summary judgment on the state law claim, finding that it was preempted by the Illinois Human Rights Act ("IHRA"), 775 ILL. COMP. STAT. § 5/1-101 *et seq.*, because the activity was inextricably intertwined with her participation in Victor's EEOC charge. We review a grant of summary judgment *de novo*. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000).

Under both Title VII and § 1981, it is illegal for an employer to take adverse action against an employee for opposing impermissible discrimination or participating in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a); *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). A plaintiff filing a retaliation claim need not have opposed an action that *in fact* violated Title VII in order to win this claim; we require only that she had a good faith, objectively reasonable belief that the action she opposed was a violation. *Fine v. Ryan International Airlines*, 305 F.3rd 746, 752-53 (7th Cir. 2002). This is not meant to be a high bar, but rather to weed out claims that are completely groundless because they rest on facts that "no reasonable person possibly could have construed as a case of discrimination." *Id.* at 752. Nelson's claims here do not get her over even this low bar.

Victor's EEOC charge claimed he was discriminated against on the basis of both race and religion. Yet Nelson admitted during her deposition that she knew of no facts to support Victor's claim of religious discrimination. Further, Nelson had an entire conversation with Adams about the unfairness of Victor's pay without once mentioning the Hispanic janitor. Rather, she was upset that Victor's replacement was being paid what Victor had been making when he left, despite having less experience than Victor. While Nelson contended at oral argument that this was one of the factors that prompted her to think Victor was discriminated against, it clearly should not have prompted her to think that the discrimination was based on Victor's race because Victor's replacement was also African-American.

In fact, the existence of the Hispanic cleaner is the only fact that even brings race to bear in this case, and all Nelson knew about the man was that he was Hispanic, a cleaner, and received a raise that brought him to a higher pay level than Victor's. Nelson argues that she is not required to conduct a similarly-situated analysis of this Hispanic cleaner and Victor in order to determine if racial discrimination occurred, and we agree. However, it is not far-fetched to suppose the thought crossed her mind that the pay differential at issue

here might be because the Hispanic cleaner had more experience or had been with Realty longer than Victor. After all, she had made that very argument when complaining about Miller's starting pay in relation to Victor's. In short, the mere fact that Victor was African-American and the other cleaner was Hispanic is not enough, in this particular situation, for a reasonable person to believe racial discrimination took place. Both Nelson and Victor were upset—with each other and with Realty—and lashed out repeatedly. This suit appears to be one more instance of that behavior. Given the totality of the circumstances, the district judge correctly found that Nelson does not have the requisite good faith, reasonable belief that Victor was discriminated against in violation of Title VII to sustain her retaliation claims.

As for Nelson's state law retaliatory discharge claim, it is preempted by the IHRA. The IHRA preempts court claims where the basis for the claim arises from a matter covered under the Act, unless the plaintiff can establish a basis for imposing liability on defendants independent of the Act. *Blount v. Stroud*, 904 N.E.2d 1, 10 (Ill. 2009). In order to prove a common law retaliatory discharge claim a plaintiff must prove that she was (1) discharged; (2) in retaliation for her activities; and (3) the discharge violates a "clearly mandated public policy." *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 881 (Ill. 1981). Nelson argues that her claim is not preempted because she need not rely on the public policy embedded in the IHRA to satisfy the third prong of this claim; rather, it can be satisfied by Illinois' strong public policy against perjury. However, Nelson has presented no evidence that she was asked to perjure herself at any time. A form titled "Termination Description Form" could as easily describe voluntary termination of a position (i.e. resignation) as forced termination. Further, Nelson admits that no one told her how to fill out the form, and, in fact, she was told to fill it out however she wanted. It is clear that Nelson was not fired for refusing to perjure herself because, plainly, no one ever asked her to do so. She has no stand-alone state law claim for retaliatory discharge related to perjury, and any claim that she could make related to Victor's EEOC charge would be preempted by the IHRA.

For the foregoing reasons, the judgment of the district court is AFFIRMED.